Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAOLO NESTORI, derivatively on behalf of BOLLINGER INNOVATIONS, INC., f/k/a MULLEN AUTOMOTIVE INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID MICHERY, JONATHAN NEW, JOHN ANDERSEN, MARK BETOR, WILLIAM MILTNER, IGNACIO NOVOA, KENT PUCKETT, and MARY WINTER, <br><br> Defendants, <br><br> and <br><br> BOLLINGER INNOVATIONS, INC., f/k/a MULLEN AUTOMOTIVE INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Paolo Nestori ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Bollinger Innovations, Inc., f/k/a Mullen Automotive Inc. ("Mullen"[1] or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David Michery ("Michery"), Jonathan New ("New"), John Andersen ("Andersen"), Mark Betor ("Betor"), William Miltner ("Miltner"), Ignacio Novoa ("Novoa"), Kent Puckett ("Puckett"), and Mary Winter ("Winter") (collectively, the "Individual Defendants," and together with Mullen, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Mullen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Michery and New for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mullen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 14, 2022 to June 2, 2025,

---

[1] The Company changed its name from Mullen Automotive Inc. to Bollinger Innovations, Inc. on July 28, 2025. Because the misconduct alleged took place before the name change, this complaint will refer to the Company as Mullen.

inclusive (the "Relevant Period").

2.      Mullen is Delaware-incorporated automotive company focused on producing electric vehicles ("EVs") by working with partners with the aim of offering luxury SUVs, sports cars, cargo vans, and solid-state batteries.

3.      Although Mullen presents itself as an EV manufacturer, in reality, it functions as a personal slush fund for its founder, Chief Executive Officer ("CEO"), President, and Chairman of the Board, Defendant Michery. During the Relevant Period, Defendant Michery received over $50 million in total compensation, despite the Company's deteriorating financial condition. In addition, Defendant Michery covertly diverted company funds for personal purposes, including undisclosed annual payments to his daughter, upkeep for his luxury car collection, and financing for his other private ventures.

4.      Mullen's operating cash flow could not support these substantial payouts, as the Company generated virtually no income. Over the past four years, Mullen reported a gross profit only once, which amounted to just $92,118, while consistently failing to produce a net profit or positive free cash flow.

5.      To fund the excessive payouts to Defendant Michery, as well as similar payments made to Defendant New, Mullen relied on the sale of securities, primarily convertible notes and warrants, which were then converted into common shares and offloaded onto retail investors. This continuous dumping of shares, along with insider sales, intensified the downward pressure on Mullen's stock price, which repeatedly fell below the $1.00 mark due to the Company's poor financial performance.

6.      Maintaining a stock price above $1.00 was crucial to the Individual Defendants' scheme. If Mullen failed to keep its share price at or above that threshold, either organically or through reverse stock splits, it risked being delisted from the Nasdaq Global Market ("NASDAQ"). Such a delisting would jeopardize Mullen's ability to continue raising funds through the sale of convertible notes, warrants, and other securities used to compensate insiders.

Verified Shareholder Derivative Complaint

7.     One method the Individual Defendants used to artificially inflate Mullen's stock price, and thereby facilitate the substantial payments to Michery (and, to a lesser extent, New), was by making false and misleading statements regarding supposed business deals. For instance, the Individual Defendants promoted a partnership purported to deliver groundbreaking EV technology to Mullen, as well as a $210 million purchase agreement with a company based in the United Arab Emirates ("UAE"). However, they deliberately withheld critical information that would have revealed these deals were entirely fraudulent. The technology at the center of the partnership did not exist, and the so-called "inventor" was a convicted felon. Even more troubling, the $210 million agreement was unenforceable because Mullen's vehicles failed to meet UAE safety regulations and were not legally eligible for sale in that market. These material facts were concealed from investors.

8.     Mullen then leveraged the artificially inflated share price created by these false statements to sell convertible notes and warrants to a select group of favored investors, raising millions in funding. After the misleading announcements, these investors exercised their warrants and converted their notes, acquiring large quantities of discounted common stock, which they subsequently dumped on retail investors. Through this scheme, Mullen profited twice: first from the initial sale of the notes and warrants, and again upon the exercise of the warrants, depending on the terms of the agreements.

9.     However, the resulting surge in common shares issued through the exercise of warrants and conversion of notes came at a significant cost: the resale of such a large volume of shares severely diluted the holdings of retail investors. After Mullen's preferred investors had exercised their warrants and convertible notes, generating millions of dollars for the Company, Mullen disclosed that the previously promoted deals, which had attracted interest from retail investors, had ultimately failed. This was either because the deals were never genuine to begin with or because undisclosed risks had materialized, leading to their collapse. These revelations inevitably drove the Company's stock price below the NASDAQ $1.00 minimum threshold, placing Mullen at risk of being delisted.

Verified Shareholder Derivative Complaint

10.    To lift its share price back above $1.00 and avoid delisting, Mullen carried out a series of reverse stock splits. Each reverse split consolidated up to 100 pre-split shares into a single post-split share. While reverse splits do not inherently change the overall value of an investor's holdings, they reduce the number of outstanding shares, thereby increasing the price per share.

11.    These reverse stock splits had a damaging impact on Mullen's retail investors, whose holdings were drastically reduced to just a few shares. Consequently, shareholders became increasingly alarmed by the recurring reverse splits, which played a central role in capital raises used to fund payouts to Defendant Michery. To preserve the ability to continue this strategy, the Individual Defendants misled investors about their intentions regarding future reverse splits.

12.    Each time Mullen used a reverse split to temporarily boost its stock price above the $1.00 mark, the Individual Defendants reignited the cycle by issuing new misleading statements aimed at attracting fresh investment from retail investors. On May 29, 2025, the Company issues a press release announcing a 1-for-100 reverse stock split, effective June 2, 2025, and the seventh reverse stock split of the relevant period.

13.    On this news, the Company's stock fell $.045, or approximately 41.7%, over the next two trading days, from an opening price of $0.127 on May 29, 2025, to a low of $0.074, to close at $0.082 on May 30, 2025.

14.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, Mullen Advanced Energy Operations, LLC ("MAEO") and Volt Mobility Holding Ltd. ("Volt Mobility"); (2) the Company overstated its battery

Verified Shareholder Derivative Complaint

technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Lawrence Hardge's ("Hardge") previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements, including those with Esousa Holdings; and (6) Individual Defendants' participation in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.    During the Relevant Period, the Individual Defendants also made a series of materially false and misleading statements regarding their participation in a scheme to utilize the Company as a personal slush fund for Defendant Michery. At all relevant times the Individual Defendants failed to disclose, *inter alia*, that they would: (1) pump up the Company's stock price with misleading announcements; (2) sell warrants and convertible notes to preferred investors, who then sell common stock to retail investors for a profit; (3) would allow Mullen stock price to fall as highly touted deals are proven illusory; and (4) the Individual Defendants would then effect a reverse stock split to meet the NASDAQ $1.00 Bid Price Requirement and restart the cycle.

16.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while six of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $5.5 million***.

18.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.    In light of the Individual Defendants' misconduct—which has subjected the

Company, its CEO and Chairman of the Company's Board of Directors (the "Board"), and its Chief Financial Officer ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Michery's and New's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

23.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Mullen is headquartered in this District.

## PARTIES

### Plaintiff

26.    Plaintiff is a current shareholder of Mullen. Plaintiff has continuously held Mullen's common stock at all relevant times.

### Nominal Defendant Mullen

27.    Mullen is a Delaware corporation with principal executive offices at 1405 Pioneer Street, Brea, California, 92821. Mullen's common stock trades on NASDAQ under the ticker symbol "MULN."[2]

### Defendant Michery

28.    Defendant Michery has served as Chairman of the Board, CEO, and President of the Company since November 2021. He held those same positions at Mullen Technologies since its inception in 2018. According to the Schedule 14A the Company filed with the SEC on January 19, 2024 (the "2024 Proxy Statement"), for the fiscal year ended September 30, 2023 (the "2023 Fiscal Year"), David Michery received $49,629,463

---

[2] On July 15, 2025, the Company announced its intention to rebrand as Bollinger Innovations and to update its NASDAQ ticker symbol to "BINI," subject to NASDAQ's approval. The change became effective on July 28, 2025, at which point the Company began trading on NASDAQ under the new name and the ticker symbol "BINI."

in total compensation from the Company. This included $750,000 in salary and $48,879,463 in stock awards.

29.   The Schedule 14A the Company filed with the SEC on February 18, 2025 (the "2025 Proxy Statement") stated the following about Defendant Michery:

> **David Michery** has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the Merger in November 2021 and held those same positions at Mullen Technologies since its inception in 2018. His automotive experience began with the acquisition of Mullen Motor Company in 2012. Mr. Michery brings over 25 years within executive management, marketing, distressed assets, and business restructuring. He acquired the assets of Coda Automotive, formerly an independent EV manufacturer, through bankruptcy as an entryway into the EV business. We believe that Mr. Michery is qualified to serve as a director because of his operational and historical expertise gained from serving as our Chief Executive Officer, and his experience within various businesses, including automotive.

30.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Michery made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|------|------------------|-------------------|----------|
| February 16, 2023 | 14,937,660[3] | $0.3164[4] | $4,720,300 |

Thus, in total, before the fraud was exposed, Defendant Michery sold 14,937,660 shares of Company stock on inside information, for which he received approximately $4.7 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

---

[3] The Form 4 filed with the SEC states: "Aggregate number of shares sold on the same date at different prices."

[4] The Form 4 filed with the SEC states: "Represents the weighted average sales price. The shares were sold in multiple transactions at prices ranging from $0.2967 to $0.3389, inclusive, per share."

9

**Defendant New**

31.    Defendant New has served as the Company's CFO since September 19, 2022. Defendant New also served as CFO of the Company's predecessor, Net Elements, Inc.

32.    The 2025 Proxy Statement stated the following about Defendant New:

***Jonathan New*** was appointed by the Board as Chief Financial Officer of the Company, effective September 19, 2022. He served as a director of the Company from November 2021 until September 19, 2022. From January 2020 until September 2022, Mr. New served as the Chief Financial Officer of Motorsport Games, Inc. (NASDAQ: MSGM), a racing game developer, publisher and esports ecosystem provider. Previously, from July 2018 to January 2020, Mr. New was Chief Financial Officer of Blink Charging Co (NASDAQ: BLNK), an owner, operator and provider of electric vehicle charging equipment and networked electric vehicle charging services, and, from 2008 to July 2018, he was Chief Financial Officer of Net Element, Inc., a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment. Mr. New is a Florida Certified Public Accountant and a member of the American Institute of Certified Public Accountants.

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant New made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|------|------------------|-------------------|----------|
| March 6, 2023 | 159,066[5] | $0.2295[6] | $36,585 |

Thus, in total, before the fraud was exposed, Defendant New sold 159,066 shares of Company stock on inside information, for which he received approximately $36,585 in total proceeds. His insider sales, made with knowledge of material nonpublic information

---

[5] The Form 4 filed with the SEC states: "Aggregate number of shares . . . sold by the Reporting Person on the same date at different prices."

[6] The Form 4 filed with the SEC states: "Represents the weighted average sales price. The Shares were sold at prices ranging from $0.2275 to $0.2315 per share."

Verified Shareholder Derivative Complaint

before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Andersen**

34.     Defendant Andersen has served as a Company director since September 2022. He also serves as a member of the Compensation Committee and as a member of the Audit Committee.

35.     The 2025 Proxy Statement stated the following about Defendant Andersen:

***John Andersen*** has served as director of the Company since September 2022. Mr. Andersen owned and operated various businesses since 1972, concentrating on real estate investment and management, primarily of multi-family residential units along with commercial sales and leases, in California, Utah and Wyoming, since 1980. From 1986 to 1996, Mr. Andersen was a partner in a large real estate company with over 300 sales agents and an escrow company, loan company and other real estate services. Since 2013, he has been a director and officer of Eminence Escrow, Inc. and, since 2015, he has owned and operated DNJ Investments, Inc., both of which provide escrow services. We believe that Mr. Andersen is qualified to serve as a director because of his extensive and in-depth experience in operating and growing businesses.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Andersen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|------|------------------|-------------------|----------|
| October 20, 2023[7] | 287,437 | $0.3437[8] | $98,878 |

---

[7] The Form 4 filed with the SEC states: "Except as indicated in footnote 3, share amounts and price do not reflect reverse stock splits subsequent to date of sale. Shares held following transaction reflect amount as of such date."

[8] The Form 4 filed with the SEC states: "The price reported in Column 4 is a weighted average price. These shares were sold in multiple transactions at prices ranging from $0.36 to $0.3436 (on a pre-split basis), inclusive. The reporting person undertakes to provide to the issuer, any security holder of the issuer, or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of shares

Verified Shareholder Derivative Complaint

| January 26, 2024[9] | 13,334 | $6.7738 | $90,324 |
| January 7, 2025[10] | 174,500 | $0.91 | $158,795 |

Thus, in total, before the fraud was exposed, Defendant Andersen sold 475,271 shares of Company stock on inside information, for which he received approximately $347,997 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Betor**

37.    Defendant Betor has served as a Company director since November 2021. He also serves as a member of the Audit Committee and Compensation Committee and as Chair of the Nominating & Governance Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Betor:

***Mark Betor*** has served as a director of the Company since November 2021 and a director of Mullen Technologies since 2018. Mr. Betor has also served as a director of DRIVEiT since January 2024. Mr. Betor is a retired businessman and law enforcement officer. Since retirement, he has been involved with real estate investments and private business. We believe that Mr. Betor is qualified to serve as a director because of his vast experience within investments and private businesses.

**Defendant Miltner**

39.    Defendant Miltner has served as a Company director since November 2021.

40.    The 2025 Proxy Statement stated the following about Defendant Miltner:

***William Miltner*** has served as a director of the Company since the closing of the Merger. He has served as a litigation attorney for over 30 years. He is the

---

sold at each separate price within the ranges set in footnote 2 to this Form 4."

[9] The Form 4 filed with the SEC states: "Except as indicated in footnote 3, share amounts and price do not reflect reverse stock splits subsequent to date of sale. Shares held following transaction reflect amount as of such date."

[10] The Form 4 filed with the SEC states: "Except as indicated in footnote 3, share amounts and price do not reflect reverse stock splits subsequent to date of sale. Shares held following transaction reflect amount as of such date."

Verified Shareholder Derivative Complaint

co-founder of Miltner & Menck, APC, a full-service law firm, in San Diego, CA. Mr. Miltner successfully co-founded and co-managed the law firm of Perkins & Miltner, LLP, a respected San Diego litigation firm for 13 years. In 2006, when co-founder David Perkins left the practice of law, Miltner Law Group, APC, was founded. Mr. Miltner has represented many publicly traded and private companies including residential developers, construction contractors, title insurance companies and banking and lending institutions. His substantial experience includes representing and defending clients in complex real property, general business, construction, title insurance and lender litigation and transactional matters. Mr. Miltner is member of the American and San Diego County Bar Associations and American Business Trial Lawyers Association. He was admitted to The State Bar of California in 1988. We believe that Mr. Miltner is qualified to serve as a director because of his knowledge and experience within law practice areas and litigation matters.

**Defendant Novoa**

41.    Defendant Novoa has served as a Company director since July 2022.

42.    The 2025 Proxy Statement stated the following about Defendant Novoa:

***Ignacio Novoa*** has served as a director of the Company since July 2022. Mr. Novoa has been a realtor at Las Lomas Realty since January 2015. Prior to that, from August 2008 to March 2021, Mr. Nova served as police officer with the Federal Reserve Police and, from September 2008 to March 2013, as program security at Northrup Grumman. Mr. Novoa has also served as a director of DRIVEiT since January 2024. We believe that Mr. Novoa is qualified to serve as a director because of his experience in managing real estate.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Novoa made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|------|------------------|-------------------|----------|
| January 7, 2025[11] | 152,865 | $0.8712 | $133,176 |

---

[11] The Form 4 filed with the SEC states: "Share amounts and price do not give effect to 1:60 reverse stock split effected on February 18, 2025. Giving effect to the reverse stock split, amount sold was 2,548 shares at $52.27 and 169 shares following the transaction."

| January 7, 2025[12] | 10,135 | $0.8801 | $8,920 |
| February 21, 2025 | 2,000 | $4.61 | $9,220 |

Thus, in total, before the fraud was exposed, Defendant Novoa sold 165,000 shares of Company stock on inside information, for which he received approximately $151,316 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Puckett**

44.     Defendant Puckett has served as a Company director since November 2021. He also serves as the Chair of the Compensation Committee and Audit Committee and is a member of the Nominating & Governance Committee.

45.     The 2025 Proxy Statement stated the following about Defendant Puckett:

***Kent Puckett*** has served as a director of the Company since November 2021 and has served on the board of Mullen Technologies since 2018. Previously, Mr. Puckett served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Mr. Puckett has also served as a director of DRIVEiT since January 2024. Mr. Puckett has many years of experience as a CFO with a proven track record of establishing cross-functional partnerships to deliver stellar results. He has led many companies in their audit and disclosure requirements, creating operations, marketing, and sales division budgets of multi-million dollars, and being accountable for the allocation of resources to exceed profit and sales goals. Mr. Puckett has a B.S. in Business Administration from Pensacola Christian College, and Advanced Studies in Management, Finance, Compliance, Insurance, Financial Consulting, Taxation and Financial Reporting, with an emphasis on Public Companies reporting and audit requirements. We believe that Mr. Puckett is qualified to serve as a director because of his finance and accounting background and experience.

---

[12] The Form 4 filed with the SEC states: "Share amount and price do not give effect to 1:60 reverse stock split effected on February 18, 2025. Giving effect to the reverse stock split, amount sold was 169 shares at $52.81."

Verified Shareholder Derivative Complaint

46.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Puckett made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|---|---|---|---|
| December 15, 2022 | 100,000 | $0.33 | $33,000 |

Thus, in total, before the fraud was exposed, Defendant Puckett sold 100,000 shares of Company stock on inside information, for which he received approximately $33,000 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Winter**

47.     Defendant Winter has served as a Company director since November 2021. She also serves as the Company's Secretary and as a member of the Nominating & Governance Committee.

48.     The 2025 Proxy Statement stated the following about Defendant Winter:

***Mary Winter*** has served as director of the Company since November 2021 and has been a director of Mullen Technologies since 2018. Ms. Winter has been an integral part of Mullen since inception. She currently serves as the Secretary of the Company and Board of Directors. Formerly, she was the Vice President of Operations for Mullen Technologies since 2014. We believe that Ms. Winter is qualified to serve as a director because of her business and operational knowledge of Mullen.

49.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Winter made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|---|---|---|---|
| October 20, | 556 | $33.9 | $18,848.40 |

| 2023[13] | | | |
|---|---|---|---|
| January 25, 2024[14] | 13,334 | $6.78 | $90,174 |
| February 27, 2025 | 2,716 | $3.73 | $10,130 |
| March 5, 2025 | 62,000 | $2.01 | $124,619 |

Thus, in total, before the fraud was exposed, Defendant Winter sold 78,606 shares of Company stock on inside information, for which she received approximately $243,771 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

## **Relevant Non-Parties**

50.    This action incorporates information from public documents including the Amended Complaint (the "Amended Complaint") in the Securities Class action, which itself incorporates statements from former Mullen employees who offered their experiences as confidential witnesses. The following are former employees whose statements are referenced throughout this complaint before this court.

### *CW1*

51.    Confidential Witness 1 ("CW1"), a senior finance executive at Mullen from June 2022 to March 2025, reported to Defendant New and Chief Accounting Officer Chester Bragado. CW1 was responsible for overseeing all aspects of Mullen's manufacturing and commercial finance. With unrestricted access to the Company's general ledger, CW1 had visibility into the full scope of Mullen's operations and expenditures, including those processed through ACH, checks, and wire transfers, giving CW1 deep

---

[13] The Form 4 filed with the SEC states: "Shares amounts and price give effect to 1:100 reverse stock split effected on December 21, 2023 and to 1:100 reverse stock split effected on September 17, 2024. Without giving effect to the reverse stock splits, amount sold was 55,555 shares at $0.339."

[14] The Form 4 filed with the SEC states: "Shares amounts and price give effect to 1:100 reverse stock split effected on September 17, 2024. Without giving effect to the reverse stock split, amount sold was 13,334 shares at $6.78."

insight into the Company's financial practices.

***CW2***

52.    Confidential Witness 2 ("CW2") was employed by Mullen from January 2022 to May 2024 as a director within the Company's sales and marketing department. CW2's responsibilities included overseeing sales and marketing initiatives, pricing labels, distribution, engineering coordination, and acting as a technical liaison between Mullen and external companies. CW2 also managed dealer sales and service agreements.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

53.    By reason of their positions as officers, directors, and/or fiduciaries of Mullen and because of their ability to control the business and corporate affairs of Mullen, the Individual Defendants owed Mullen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Mullen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Mullen and its shareholders so as to benefit all shareholders equally.

54.    Each director and officer of the Company owes to Mullen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mullen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.    To discharge their duties, the officers and directors of Mullen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty,

good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mullen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

58.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Mullen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Mullen's corporate governance and applicable business practice standards;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Mullen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Mullen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Mullen's operations would comply with all applicable laws and Mullen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and

duties set forth above.

60.     Each of the Individual Defendants further owed to Mullen and its shareholders the duty of loyalty requiring that each favor Mullen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Mullen and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, directorial, and controlling positions with Mullen, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mullen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and

(iii) artificially inflate the Company's stock price.

66.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Mullen was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mullen and was at all times acting within the course and scope of such agency.

## MULLEN'S CODE OF ETHICS

69.    Mullen's Code of Ethics and Business Conduct (the "Code of Ethics") states that it "set[s] expectations and provide[s] guidance applicable to all members of the Company's Board of Directors (the 'directors') and officers, employees, independent contractors, and consultants of the Company (all for such purposes of this Code, 'employees')."

70.    In the section "Insider Trading," the Code of Ethics states:

Every employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision based on this information. It is illegal, and it is a violation of this Code. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business. Employees must exercise the utmost case when in possession of material nonpublic information.

71.    In the section "Amendment and Waiver," the Code of Ethics states:

Any amendment or waiver of this Code must be in writing and must be authorized by most of the members of the Board or, to the extent permissible under applicable laws, rules and regulations, a committee of the Board if the Board has delegated such authority to a committee. The Company will notify employees of any material changes to this Code. Any such amendment or waiver may be publicly disclosed if required by applicable laws, rules and regulations.

72.    In the section "Financial Integrity; Public Reporting," the Code of Ethics states, in relevant part:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately, and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees, and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

Verified Shareholder Derivative Complaint

- no entry be made in the Company's books and records that is intentionally false or misleading.
- transactions be supported by appropriate documentation.
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records.
- employees comply with the Company's system of internal controls and be held accountable for their entries.
- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed.
- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents.
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules, and regulations of the SEC or other applicable laws, rules and regulations.
- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's

books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.
- In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:
- act honestly, ethically, and with integrity.
- comply with this Code.
- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC.
- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed.
- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

73.     In the section "Legal Compliance," the Code of Ethics states:

All employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate

course of action. See Section 18 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

74.    In the section "Protection and Proper Use of Company Assets," the Code of Ethics states:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness, and waste have a direct impact on the Company's business and operating results. Company property, such as computer equipment, buildings, furniture and furnishings, office supplies, products, and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received, or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

75.    In the section "Administration Of This Code," the Code of Ethics states:

The Audit Committee is responsible for reviewing this Code as set forth in the Audit Committee's charter and overseeing the establishment of procedures for the prompt internal reporting of violations of this Code. It may request reports from the Company's executive officers about the implementation of this Code and may take any steps in connection with the implementation of this Code as it deems necessary, subject to the limitations set forth in this Code. The Audit Committee will have the authority to review and assess this Code and recommend revisions for approval by the Board. The Company will notify directors of any material changes to this Code.

76.    In the section "Responsibility for the Investigation," the Code of Ethics states:

The Board is ultimately responsible for the investigation and resolution of all suspected or actual violations of this Code. Alleged violations of this Code will be investigated by the Audit Committee and may result in discipline and other action at the discretion of the Board upon recommendation of the Audit Committee, including, where appropriate, removal from the Board. The Board and the Audit Committee will conduct their investigations with the highest degree of confidentiality that is possible under the specific circumstances. The

Audit Chair, the Audit Committee or the General Counsel may consult with other members of the Board and outside counsel as appropriate.

77.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment, including six Individual Defendants who sold Company stock on inside information. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Mullen's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## **MULLEN'S AUDIT COMMITTEE CHARTER**

78.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> The purpose of the Audit Committee of the Board of Directors (the "Board") of Mullen Automotive, Inc., (the "Company") shall be to:
> 1. Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements.
> 2. Assist the Board in oversight of
>    a. the integrity of the Company's financial statements,
>    b. the Company's compliance with legal and regulatory requirements,
>    c. the independent auditor's qualifications, independence, and performance,
>    d. the organization and performance of the Company's internal audit function,
>    e. the Company's internal accounting and financial controls,
>    f. the Company's treasury and finance matters, and

g. the Company's risk management, including data privacy and security

3. Provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

In furtherance of these purposes, the Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

1. The Audit Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the independent auditors.

2. The Audit Committee relies on the expertise and knowledge of management, the internal auditor, and the independent registered accounting firm in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles and for establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting.

3. The independent registered accounting firm is responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements.

4. It is not the responsibility of the Audit Committee to prepare or certify the Company's financial statements or guarantee the audits or reports of the independent auditors, nor is it the duty of the Audit Committee to certify that the independent auditor is "independent" under applicable rules. These are the fundamental responsibilities of management and the independent auditors.

79.    In the section "Responsibilities, Duties and Powers" under the subheading "Review Procedures," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting,

including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

2. Reviewing and providing oversight of the external audit by:

   a. reviewing the independent auditors' proposed audit scope and approach.

   b. discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, disagreements with management and any other required communications described in applicable accounting standards.

   c. reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors, and other material written communications between the independent auditors and management.

   d. reviewing reports submitted to the audit committee by the independent auditors in accordance with applicable SEC requirements.

3. Reviewing and approving the annual internal audit project plan and any proposed changes and reviewing periodic reports summarizing results of the internal audit projects.

4. Reviewing and discussing with management earnings releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

5. Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC.

Verified Shareholder Derivative Complaint

6. Recommending to the Board, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC.

7. Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

8. Conducting a post-audit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors, and management's response to such suggestions.

9. Reviewing, prior to announcement, Company press releases and other disclosures containing financial information for the purpose of ensuring that such press releases and other disclosures properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, adequately disclose how such non-GAAP information differs from the comparable GAAP information and ensure that disclosure of such non-GAAP information is not given undue prominence and that such non-GAAP information does not provide a misleading presentation of the Company's results of operations or financial condition.

10. Discussing guidelines and policies with respect to risk assessment and risk management with the Company's management and overseeing financial risk exposures, including monitoring the Company's financial condition and investments, the integrity of the Company's financial statements, accounting matters, internal controls over financial reporting, the independence of the Company's independent auditor, and guidelines and policies with respect to risk assessment and risk management.

11. Overseeing the Company's annual enterprise business risk assessment, which is conducted by the internal audit function and which includes review of the primary#risks facing the Company and the Company's associated risk mitigation measures.#

12. Reviewing and approving in advance when possible, or ratifying as soon as reasonably practicable, any related person transactions.

13. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements.

14. Reviewing insurance coverage.

15. Investigating, or authorizing on its behalf an investigation of, any matter relating to any purpose, responsibility, duty, or power of the Audit Committee set forth in this charter or applicable law, or delegated to the

Audit Committee by the Board, and obtaining unrestricted access to the Company's books, records and employees in furtherance of any such investigation.

16. Reviewing its own charter and processes on an annual basis

80.    In the same section, under the subheading "Regulatory Compliance and Other Matters," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and audit committee members, member qualifications and activities.
2. Reviewing management's monitoring of compliance with the US Foreign Corrupt Practices Act and any other similar applicable regulations.
3. Providing a report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC.
4. Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.
5. Reviewing and discussing with management the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs.

81.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly

report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Background

82.    The entity that would eventually become Mullen was initially established by Michery on April 20, 2010. Prior to this, Defendant Michery had been involved with a luxury sunglasses company whose securities registration was revoked due to its failure to file required periodic reports.

83.    In 2012, aiming to capitalize on growing public interest in electric vehicles, Defendant Michery acquired Mullen Motor Company despite having no prior experience in the automotive industry.

84.    Two years later, in 2014, Defendant Michery merged Mullen Motor Cars with CODA Automotive, an EV company that he acquired out of bankruptcy.

85.    On June 16, 2020, the combined company announced plans to go public through a reverse merger with Net Element, Inc., a struggling payment processing firm listed on the NASDAQ under the ticker symbol "NETE." At the time, Defendant New had previously served as CFO of Net Element from 2008 to July 2018.

86.    The reverse merger was completed nearly 17 months later, after which the newly combined entity was renamed "Mullen Automotive Inc." On November 5, 2021, Mullen began trading on the NASDAQ under the ticker symbol "MULN."

### The Company's Current Status

87.    Throughout the Relevant Period, Mullen remained a small startup with no commercially viable EVs, no capacity for mass production, and minimal revenue. Over the past four years, the Company reported a gross profit only once—totaling just $92,118—and has never achieved consistent revenue generation.

88.    The following table summarizes Mullen's revenue, expenses, and net losses before and during the Relevant Period:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Revenue | $0 | $0 | $366,000 | $1,094,322 |
| Cost of Revenues | N/A | N/A | $273,882 | $16,894,100 |
| Loss from Operations | $22,402,968 | $96,989,096 | $377,772,350 | $391,826,449 |
| Net Loss | $44,240,580 | $740,324,752 | $1,006,658,828 | $505,826,551 |

89.     Throughout the Relevant Period, Mullen's liabilities always surpassed its cash generated:

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Cash and Cash Equivalents | $42,174 | $54,085,685 | $155,267,098 | $10,321,827 |
| Total Current Assets | $6,811,055 | $86,333,844 | $198,130,456 | $63,174,638 |
| Total Liabilities | $78,884,141 | $145,637,771 | $148,897,620 | $195,177,166 |

90.     During the Relevant Period, the Company consistently depleted its cash reserves, directing the majority of spending toward general and administrative expenses, including Defendant Michery's excessive compensation, while allocating comparatively little to research and development.

|  | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| General and Administrative | $19,393,941 | $75,338,256 | $215,846,132 | $181,947,541 |

| Expenses | | | | |
|---|---|---|---|---|
| **Research and Development Expenses** | $3,009,027 | $21,650,840 | $77,387,336 | $74,889,400 |

91.    Mullen's ongoing failure to generate revenue, its rapid cash depletion, including significant payouts to Defendant Michery, the emergence of previously undisclosed risks, and the strain from repeated capital raises all contributed to a sustained decline in its share price below $1.00, ultimately jeopardizing the Company's NASDAQ listing.

**The Company's NASDAQ Listing**

92.    To be initially listed on the NASDAQ, companies must meet certain requirements, including: (1) a minimum bid price of $4.00 per share at the time of listing; (2) at least 1 million publicly held shares; and (3) either 450 round lot shareholders, 2,200 total shareholders, or 550 total shareholders with an average trading volume of at least 1.1 million shares over the preceding 12 months. In addition to these criteria, companies must also satisfy specific financial benchmarks, such as minimum levels of cash flow and total assets.

93.    To maintain their listing, NASDAQ rules require that companies listed on the Nasdaq Global Select Market, Global Market, or Capital Market maintain a minimum bid price of $1.00 per share (the "Bid Price Requirement").

94.    The Bid Price Requirement serves a critical investor protection function by helping to prevent the listing and trading of so-called "penny stocks," which are typically characterized by low liquidity, high volatility, and a heightened risk of market manipulation. By enforcing this threshold, NASDAQ promotes market integrity and ensures listed companies meet a minimum standard of financial stability and investor confidence.

95.    If a listed company falls below the $1.00 Bid Price Requirement, NASDAQ

Rule 5810(c)(3)(A) grants the company an automatic 180-calendar-day grace period from the date of notice to regain compliance.

96.    A company is deemed to have failed the Bid Price Requirement if its securities close with a bid price below $1.00 for 30 consecutive business days. *See* NASDAQ Rule 5810(c)(3)(A). A company may regain compliance by maintaining a closing bid price of at least $1.00 for a minimum of 10 consecutive business days within the designated compliance period, although NASDAQ retains discretion to require a longer compliance window pursuant to Rule 5810(c)(3)(H).

97.    If a company does not satisfy the Bid Price Requirement during the applicable compliance period, NASDAQ will typically issue a delisting determination in accordance with Rule 5810. The company may appeal this determination, which pauses the delisting process while the appeal is pending. Consequently, a company may remain non-compliant with the Bid Price Requirement and still continue trading on NASDAQ for up to 540 days.

98.    For Mullen, delisting from NASDAQ would have severe consequences, significantly impairing its ability to raise capital from outside investors. Therefore, the Individual Defendants recognized that maintaining the Company's NASDAQ listing was essential to its continued operations and financial viability. This was acknowledged in the Company's January 13, 2023 Form 10-K filed with the SEC for the fiscal year ended September 30, 2022 (the "FY22 10-K"). The FY22 10-K stated, in relevant part:

> Our common stock is listed on the Nasdaq Capital Markets. To maintain that listing, we must satisfy minimum financial and other requirements including, without limitation, a requirement that our closing bid price be at least $1.00 per share. On September 7, 2022, we were notified by NASDAQ Listing Qualifications Staff about bid price deficiency. The Board and Management are reviewing plans to regain compliance with the $1.00 closing bid price requirement. If the Company does not regain compliance with the bid price requirement by March 6, 2023, the Company may be eligible for an additional 180-calendar day compliance period so long as it satisfies the criteria for initial listing on the Nasdaq Capital Market and the continued listing requirement for market value of publicly held shares and the Company provides written notice to Nasdaq of its intention to cure the deficiency during

the second compliance period by effecting a reverse stock split, if necessary. ***If we fail to continue to meet all applicable continued listing requirements for The Nasdaq Capital Market in the future and Nasdaq determines to delist our common stock, the delisting could adversely affect the market liquidity of our common stock, our ability to obtain financing to repay debt and fund our operations.***[15]

99.    On January 17, 2023, the Company filed its Form 10-K with the SEC for the fiscal year ended September 20, 2023 (the "FY23 10-K"). In the FY23 10-K, the Individual Defendants reiterated the above warning, stating, in relevant part:

> If our common stock cease to be listed for trading on the Nasdaq Capital Market, we would expect that our common stock would be traded on one of the three tiered marketplaces of the OTC Markets Group. If Nasdaq were to delist our common stock, it would be more difficult for our stockholders to dispose of our common stock or warrants and more difficult to obtain accurate price quotations on our common stock. Our ability to issue additional securities for financing or other purposes, or otherwise to arrange for any financing we may need in the future, may also be materially and adversely affected if our common stock or warrants are not listed on a national securities exchange. The OTC Markets (the "OTC Mkts") are generally regarded as a less efficient trading market than the NASDAQ Capital or Global Markets or the New York Stock Exchange.

100.    To preserve the Company's NASDAQ listing and enable continued access to investor capital, Defendant Michery determined that the Company would execute reverse stock splits whenever the share price fell significantly below the $1.00 threshold.

**Reserve Stock Splits**

101.    During the Relevant Period, the Individual Defendants were intent on keeping Mullen's stock price above the $1.00 threshold to maintain the Company's listing on the NASDAQ. To achieve this, they executed a series of reverse stock splits, which artificially inflated the stock's trading price while significantly reducing the number of shares held by existing investors.

102.    A reverse stock split is a corporate maneuver in which a company consolidates

---

[15]All emphasis has been added herein.

its outstanding shares, reducing the total share count while increasing the price per share proportionally. Essentially, multiple existing shares are combined into one based on a set ratio—such as 1-for-10 or 1-for-100.

103.    Although the share price rises, the investor's overall holding value remains unchanged, as market capitalization is preserved. For instance, an investor holding 100 shares at $1 each (totaling $100) would, after a 1-for-10 reverse split, own 10 shares valued at $10 each, still amounting to $100 in total investment.

104.    Companies often implement reverse stock splits to raise their stock's trading price, with the goal of attracting investors or regaining compliance with the minimum bid price requirements of the exchange where their shares are listed.

105.    Due to the potential for abuse, the SEC recently acted to limit the misuse of reverse stock splits. On January 17, 2025, the SEC approved amendments to NASDAQ Rules 5810 and 5815 concerning the Bid Price Requirement. Under the revised rules, if a company fails to meet the Minimum Bid Price Requirement and has already conducted a reverse stock split within the past year, it will no longer be granted the standard 180-day grace period to regain compliance and will instead face immediate delisting. However, the company may still appeal the decision to the NASDAQ hearings panel, which could grant up to 180 days for compliance. These rule changes took effect after the Relevant Period and therefore did not restrict the Individual Defendants' use of reverse stock splits during that time.

106.    NASDAQ introduced these changes to address concerns that companies repeatedly relying on reverse stock splits or failing to meet bid price requirements could mislead investors and undermine market integrity. Such actions may conceal underlying financial or operational problems, create investor confusion, and increase the risk of market manipulation. By tightening the timeline for non-compliant securities and imposing greater scrutiny on certain reverse splits, NASDAQ aimed to safeguard investors and uphold a fair and transparent market environment.

Verified Shareholder Derivative Complaint

107.   The SEC specifically cited schemes similar to the one used by the Individual Defendants as a key reason for implementing the rule change:

> [NASDAQ] has continued to observe some companies engaging in a pattern of effecting consecutive reverse stock splits, which are often accompanied by dilutive issuances of securities and which potentially cause investor confusion and operational difficulties for market participants.

108.   Importantly, the SEC observed that "such securities may have similar characteristics to penny stocks and yet, because they are listed on the [NASDAQ], are exempt from the Penny Stock Rules, which provide enhanced investor protections, among other things, to prevent fraud and safeguard against potential market manipulation."

**Defendant Michery Personally Profits at Expense of Investors**

109.   Mullen's true function appears less about producing and selling EVs, and more about operating as a vehicle for Defendant Michery's personal enrichment.

110.   Despite Mullen generating little to no revenue and reporting significant losses year after year, Defendant Michery has received exceptionally high compensation as CEO. According to the 2024 Proxy Statement, for the fiscal year ended September 30, 2022 (the "2022 Fiscal Year"), he was awarded $11,524,440 in cash and stock, even as the Company acknowledged it had not yet commercialized any of its proposed EV products or generated revenue from them, and reported an operational loss of $96,989,096.

111.   According to the 2024 Proxy Statement, in the 2023 Fiscal Year, Defendant Michery's compensation soared to $49,629,463 in cash and stock, while Mullen admitted it had "generated minimal revenue to date," selling just $366,000 worth of vehicles. That year, the Company posted a gross profit of only $92,118 and an operating loss of $377,772,350.

112.   According to the 2025 Proxy Statement, in the fiscal year ended September 30, 2024 (the "2024 Fiscal Year"), Defendant Michery received another $3,250,000 in compensation.

113.    According to CW1, who had direct visibility into Mullen's financial transactions, Defendant Michery had been secretly paying his daughter, who was not employed by the Company, an unofficial salary of approximately $160,000 per year since 2022. In addition, she received a $50,000 "bonus" timed with her wedding. These payments were made outside normal accounting channels, as Defendant Michery circumvented Mullen's finance and accounting departments by issuing wire transfers directly through his exclusive control over treasury operations.

114.    According to CW2, Defendant Michery personally signed all of Mullen's checks, giving him direct oversight and knowledge of all payments made to employees.

115.    CW1 further reported that Defendant Michery arranged for Mullen to appoint Makayla Brown—his romantic partner—as the Company's Director of Operations.

116.    In addition, CW1 revealed that Defendant Michery owns a fleet of luxury vehicles and has Mullen cover all maintenance expenses, which typically amount to thousands of dollars. These costs were never charged to Defendant Michery personally but were instead paid by the Company. CW1 confirmed this information based on entries recorded in Mullen's general ledger.

117.    CW1 also stated that in 2024, Defendant Michery directed Mullen to purchase a luxury suite for Anaheim Ducks home games, along with season tickets for the Los Angeles Angels. The costs for these sports-related expenses were likewise documented in the Company's general ledger.

118.    In addition to securing perks for himself and his family, Defendant Michery uses Mullen and its employees to support his new business ventures, including DRIVEiT. DRIVEiT, a start-up owned personally by Defendant Michery, aims to operate as an "electric vehicle superstore." In addition to Defendant Michery, Defendant New serves as DRIVEiT's CFO, and Defendants Puckett, Novoa, and Betor all serve on DRIVEiT's board of directors.

119.    According to CW1, Defendant Michery directed Mullen employees to spend

their time working on DRIVEiT projects, despite the Company having no ownership interest in it, instead of focusing on securing deals for Mullen. Moreover, Mullen supplies its commercial EVs to DRIVEiT as part of its product offerings.

120.   Meanwhile, Mullen sold $1,094,322 in vehicles but posted a gross loss of $15,799,778 and an operating loss totaling $391,826,449.

121.   The chart below outlines Mullen's financial performance across this period, alongside Defendant Michery's steadily increasing compensation:

| | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 |
|---|---|---|---|---|
| Revenue | $0 | $0 | $366,000 | $1,094,322 |
| Cost of Revenues | N/A | N/A | $273,882 | $16,894,100 |
| Loss from Operations | $22,402,968 | $96,989,096 | $377,772,350 | $391,826,449 |
| Net Loss | $44,240,580 | $740,324,752 | $1,006,658,828 | $505,826,551 |
| Defendant Michery's Total Compensation | $2,382,088 | $11,524,440 | $49,629,463 | $3,250,000 |

122.   Defendant Michery's compensation has also been structured in a way to shield him from the negative effects of reverse stock splits and shareholder dilution. According to a Bloomberg article entitled, "A 69,000% EV Dilution Machine Runs Out of Road: Chris Bryant," under the terms of his compensation agreements, Defendant Michery is entitled to receive 1% of Mullen's outstanding shares for every $100 million in equity or debt financing he secures.

123.   In addition to his substantial salary, Defendant Michery also receives $500,000 in annual reimbursement for personal expenses.

124.   During a Fox News interview on August 31, 2023, Defendant Michery was pressed about the scale of his compensation when the interviewer asked him:

David, let me go back now to the company. A lot of concerns about your salary, the losses. I went through the last quarter. One thing that jumped out at me on . . . General and Administrative spending was $31 million. Just as a business itself, why are you spending 31 million on SG&A costs and things like. People are saying, you've taken a lot of money, you've paid yourself a lot of money, and this kind of spending, it just doesn't make sense for a small company like yours.

125.   In response, Defendant Michery gave a vague and evasive answer before his audio conveniently cut out. He stated, "Well, in relation to, let's say, compensation, whatever compensation that was awarded me and my employment contract, our compensation pursuant to awards were given…." As he stumbled through the explanation and appeared unable to justify his pay, the audio feed was abruptly terminated. Even when directly asked, Defendant Michery failed to provide a coherent defense of his compensation.

126.   Defendant Michery's excessive salary, however, was just the beginning. He also leveraged the Company's resources to fund extravagant perks for himself and individuals within his circle.

127.   Defendant New received substantial compensation as Mullen's CFO throughout the Relevant Period. According to the 2025 Proxy Statement, in the 2024 Fiscal Year, his compensation rose to $2,098,405, all while the Company failed to generate any meaningful revenue.

128.   Additionally, Defendant Winter, reported to be Michery's sister-in-law, is paid $5,000 per month ($60,000 annually) for "consulting" services.

129.   Likewise, according to Mullen's Form 10-K filed with the SEC on January 24, 2025 (the "FY24 10-K"), Defendant Miltner was paid $1,180,733 that year for "legal services" provided to Mullen, an amount exceeding the Company's entire revenue for 2024.

130.   In order to maintain his lifestyle and side ventures, Defendant Michery relied on continuously funneling money into the Company. Traditional methods of raising capital

were unavailable: Mullen's EV business was largely illusory, failing to generate operating profits or free cash flow, and its poor track record made it unappealing to major institutional investors, limiting access to capital markets through typical stock offerings. As a result, Defendant Michery devised a scheme to keep the flow of funds to Mullen, and himself, going strong. The scheme operated in four steps: (1) pump up the Company's stock price with misleading announcements; (2) sell warrants and convertible notes to preferred investors, who then sell common stock o retail investors for a profit; (3) Mullen stock price falls as highly touted deals are proven illusory; and (4) the Company would effect a reverse stock split to meet the NASDAQ's $1.00 Bid Price Requirement and restart the cycle.

### 1. Generate Investor Interest Through Misleading Announcements

131.    First, Defendant Michery stirred investor enthusiasm by issuing misleading press releases and announcements about upcoming Mullen projects and deals—many of which either never existed or were significantly overstated.

132.    For example, on August 26, 2024, Mullen and Michery announced that Volt Mobility, based in the UAE, had agreed to purchase 3,000 Mullen vehicles for $210 million. This news attracted investors, causing Mullen's share price to surge 69%, from $0.34 to a peak of $0.575. In reality, Mullen vehicles were not even capable of being sold in the UAE market. They were not equipped to withstand the region's extreme heat and failed to meet the UAE's certification standards. According to CW1, Mullen's vehicles were still at least a year away from obtaining the necessary certifications, which would have required an investment of $25 million, funds the Company did not have. Most importantly, the batteries in Mullen's vehicles did not comply with the heat tolerance and homologation standards and the Individual Defendants were fully aware of this information. Despite this, these critical facts were deliberately withheld from press releases and social media posts in order to artificially boost investor interest.

133.    Moreover, the Individual Defendants made strategic decisions not based on the Company's operational needs, but rather to hide known issues from investors.

41

According to CW1, Mullen had not manufactured any vehicles at its plant in Tunica, Mississippi since late 2024. Despite this, CW1 confirmed that Mullen refused to lay off workers because the Individual Defendants did not want to alarm the market or create the appearance of a company in decline. Similarly, CW1 reported that after the Company decided in November 2023 to discontinue production of the Mullen Five vehicle, it delayed laying off an engineering team of about 70 employees in Irvine, California until January 2025 to avoid signaling financial trouble to outsiders.

134.    The Individual Defendants also manipulated financial reporting by delaying revenue recognition. CW1 stated that Mullen postponed reporting a $3.18 million transaction from October 2024 until March 26, 2025, because the Individual Defendants wanted to include this revenue in a later period to claim "record GAAP revenue" in 2025 and attract more retail investors. CW1 was aware of this delay because they created the invoice for the transaction and were responsible for revenue recognition at Mullen. CW1 was kept informed of every detail regarding this transaction and even discussed proper revenue recognition with Defendant New, who dismissed the concerns.

135.    These actions were intended to, and did, mislead retail investors, artificially boosting Mullen's stock price. The inflation of the stock price caused by the Relevant Period misrepresentations, combined with the deceptive scheme described here, helped keep Mullen listed on NASDAQ, which the Individual Defendants acknowledged was critically important.

### 2. Sell Warrants and Convertible Notes to Favored Investors

136.    Mullen primarily raised the capital used to pay Defendant Michery and others not through traditional public offerings, but by selling warrants and convertible notes to select investors.

137.    A warrant is a financial instrument that gives the holder the right to purchase a company's stock at a predetermined price (the "strike price") within a set timeframe. When a warrant is exercised, new shares are issued, increasing the total outstanding shares.

Additionally, the issuing company receives payment for these shares at the agreed-upon strike price upon exercise. Investors buy warrants hoping the stock price will rise above the strike price so they can exercise the warrant and sell the newly issued shares for a profit. For example, if an investor receives a warrant with a $50 strike price and the stock price rises to $60, they can exercise the warrant and sell the shares for a $10 per share gain. Importantly, the company can benefit twice in this process, once from selling the warrant itself, and again when the warrant is exercised, depending on the terms.

138.    A convertible note is a financing tool where investors lend money to a company with the option to convert that loan into equity at a later date, often at a discounted rate. For example, if a company issues a $100,000 convertible note with a 20% conversion discount and the stock is trading at $2.00 per share, the investor can convert the note to purchase shares at $1.60 each. The investor can then potentially resell those shares at the higher market price, realizing a significant profit if the stock continues to increase.

139.    During the Relevant Period alone, Mullen sold more than $300 million worth of warrants and convertible notes to select, favored investors. While the group of favored investors varied, the primary entities providing funding to Mullen by purchasing and exercising these instruments included Esousa Holdings, LLC (managed by Michael Wachs), Michael Wachs 2022 Dynasty Trust, JADR Capital 2 Pty Ltd, TD Capital No 1 Pty Limited, and Acuitas Capital LLC (collectively, the "Favored Investors").

140.    These Favored Investors were then able to sell their shares to retail investors for their own benefit. However, this practice was detrimental to retail common shareholders because it flooded the market with shares. As a Bloomberg article entitled, "A 69,000% EV Dilution Machine Runs Out of Road: Chris Bryant," observed:

> Mullen has survived by issuing stupefying volumes of stock (plus warrants to acquire even more shares) to a handful of professional investors such as Acuitas Capital LLC and Esousa Holdings LLC. Those investors are then able to flip most of their holdings to the company's retail investors for a quick and sizeable profit. Needless to say, Mullen shareholders haven't shied away from expressing their anger on social

media about what they've described as "toxic" financing.

***

While regulations prevent Mullen's financiers from owning more than 10% of outstanding stock at any one time, these restrictions do not prevent them from selling shares and then exercising warrants for additional shares soon after. "In this way, the selling stockholders could sell more than 9.99% of the outstanding shares of common stock in a relatively short time frame while never holding more than 9.99% at any one time," the prospectus warns.

141.    During the Relevant Period, as warrants and convertible notes were exercised, Mullen registered and authorized approximately 6,944,251,311 potential additional shares of common stock for resale to retail investors:

| Date of Registration | Number of Common Shares Registered/Authorized for Sale by Selling Stockholders | Amount Mullen Stood to Receive from Full Warrant Exercises | Selling Stockholders |
|---|---|---|---|
| November 21, 2022 | 220,828,539 | Mullen's filing does not list the amount | -Esousa Holdings LLC<br>-Acuitas Capital, LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Digital Power Lending, LLC |
| March 6, 2023 | 522,222,223 | $37 million | -Acuitas Capital LLC |
| April 14, 2023 | 2,115,000,000 | $83.25 million | -Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC |

|  |  |  | -Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |
|---|---|---|---|
| June 5, 2023 | 242,124,674 | Mullen's filing does not list the amount | -Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited |
| June 12, 2023 | 585,937,467 | $83.2 million | -Esousa Holdings, LLC<br>-Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |
| June 26, 2023 | 2,335,128,757 | $139.4 million | -Esousa Holdings, LLC |

| | | | |
|---|---|---|---|
| | | | -Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Davis-Rice Pty Limited<br>-Ault Lending, LLC f/k/a Digital Power Lending, LLC |
| October 27, 2023 | 103,009,651 | $61 million | -Esousa Holdings, LLC<br>-Michael Wachs 2022 Dynasty Trust<br>-Acuitas Capital LLC<br>-TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited |
| May 20, 2024 | 20,000,000 | $29.1 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| July 5, 2024 | 75,000,000 | $150 million | -Esousa Holdings, LLC |
| July 26, 2024 | 85,000,000 | $19.8 million | -Esousa Holdings, LLC |

Verified Shareholder Derivative Complaint

| | | | |
|---|---|---|---|
| | | | -Ault Lending, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| September 26, 2024 | 350,000,000 | $87.1 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| October 4, 2024 | 30,000,000 | $102.9 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
| January 29, 2025 | 50,000,000 | $247.6 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon |

Verified Shareholder Derivative Complaint

| | | | -Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |
|---|---|---|---|
| March 4, 2025 | 10,000,000 | $115 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Mario Silva<br>-TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited |
| April 7, 2025 | 200,000,000 | $210 million | -Esousa Holdings, LLC<br>-JADR Capital 2 Pty Ltd<br>-TD Capital No 1 Pty Limited f/k/a Davis-Rice Pty Limited<br>-Michael Friedlander<br>-Jess Mogul<br>-Jim Fallon<br>-Philip Bannister<br>-Matthew Krieger<br>-Mario Silva |

142.   Importantly, the warrants held by the Favored Investors were not adversely affected by Mullen's reverse stock splits. On the contrary, these investors actually benefited, as the reverse stock splits, along with the Individual Defendants' misleading announcements, helped push Mullen's stock price above the warrants' strike prices. This enabled the Favored Investors to exercise their warrants and sell the resulting common stock to retail investors at substantial profits.

143.   Mullen profited from this scheme both when it initially sold the warrants and

again when the Favored Investors exercised them, injecting additional capital into the Company.

144.    The table below details the amount of capital raised through the issuance of additional Mullen stock during the Relevant Period:

| | Fiscal Year ended September 30, 2021 | Fiscal Year ended September 30, 2022 | Fiscal Year ended September 30, 2023 | Fiscal Year ended September 30, 2024 | Six Months Ended March 31, 2025 |
|---|---|---|---|---|---|
| **Cash Provided by Financing Activities** | $17,692,704 | $197,282,630 | $358,416,885 | $56,755,744 | $44,020,360 |

145.    For instance, in fiscal year 2023, Mullen raised $196,999,970 through the issuance of common and preferred shares and warrants, which is an amount that exceeded EV sales of $366,000 by more than 538 times.

### 3. The Company's Stock Declines when Mullen's Touted Deals are Proven Illusory

146.    The Individual Defendants repeatedly promoted false "deals" that ultimately failed to generate revenue, as these agreements proved to be illusory from the outset.

147.    For instance, on March 20, 2025, the Company abruptly announced that it had issued a termination notice to Volt Mobility regarding the Purchase Agreement entered into on August 23, 2024.

148.    On this news, the price of the Company's stock fell 30.7% over two days, from $0.40 to a low of $0.2773, before closing at $0.289 on March 21, 2025. According to CW1, despite the announcement of a $210 million purchase order, Mullen had not sold a single vehicle under the Volt Mobility agreement.

149.    The exposure of these misleading statements prompted investors to offload their Mullen shares, driving the stock price below NASDAQ's $1.00 Bid Price Requirement.

### 4. Effect a Reverse Stok Split to Avoid Being De-Listed on the NASDAQ and Restart the Cycle

150.   Each time Mullen's stock fell below the $1.00 threshold, the Individual Defendants would restart the cycle by initiating a reverse stock split, temporarily lifting the share price above NASDAQ's $1.00 Bid Price Requirement.

151.   Notably, Mullen's reverse stock splits deviated from standard practice. Typically, a reverse split reduces both the number of outstanding shares and the number of authorized shares proportionally, preserving each investor's ownership percentage. For instance, in a typical 1-for-100 reverse split, an investor holding 1,000 shares would end up with 10, and the authorized shares would also drop from 100 million to 1 million, maintaining the investor's proportional stake.

152.   In contrast, Mullen's reverse splits only reduced the number of outstanding shares while leaving the authorized share count and the par value unchanged. This approach significantly increased the Company's capacity to issue new shares. Using the same example, after a 1-for-100 reverse split, an investor's 1,000 shares would become 10, but Mullen would retain the ability to issue up to 100 million authorized shares. As a result, the investor's ownership percentage was diluted, diminishing the value of their holdings substantially.

153.   Because of the Company's stagnant revenue, investors grew increasingly concerned, prior to the Relevant Period, about Mullen's declining stock price and the risk of being delisted from NASDAQ. To alleviate these concerns and artificially inflate the stock price, the Individual Defendants misrepresented both their intentions and the necessity of conducting reverse stock splits

154.   Despite prior assurances to the contrary, on May 4, 2023, the Individual Defendants executed a 1-for-25 reverse stock split to push Mullen's share price above NASDAQ's $1.00 minimum bid requirement.

155.   Throughout the remainder of the Relevant Period, the Individual Defendants continued this deceptive pattern by privately planning and carrying out additional reverse

splits while publicly denying any such intentions. In total, following the stock's decline caused by the market's realization of the Individual Defendants' false statements, Mullen conducted six more reverse stock splits during the Relevant Period: (1) August 11, 2023: 1-for-9 reverse stock split; (2) December 21, 2023: 1-for-100 reverse stock split; (3) September 17, 2024: 1-for-100 reverse stock split; (4) February 18, 2025: 1-for-60 reverse stock split; (5) April 11, 2025: 1-for-100 reverse stock split; and (6) June 2, 2025: 1-for-100 reverse stock split.

156.  The Individual Defendants' repeated and strategic use of reverse stock splits inflicted severe losses on investors. For example, an investor holding 1 million shares of common stock prior to the May 4, 2023 reverse split would have been left with less than a single share, specifically, a fractional share of just 0.00000074, following the final reverse split on June 2, 2025, when trading opened at $5.19.

157.  After each reverse split, the Individual Defendants would restart the cycle by issuing new misleading press releases and announcements designed to lure fresh retail investors into purchasing Mullen's common stock.

**The Individual Defendants Create a New Series of Stock and Begin Effecting Reverse Stock Splits**

158.  Prior to the start of the Relevant Period, it appeared unlikely that shareholders would vote in favor of authorizing additional reverse stock splits. To circumvent an anticipated negative outcome, the Individual Defendants devised a plan involving the creation of a new class of stock, Series AA Preferred Stock, which carried 1.3 billion votes per share. This stock granted its holder voting rights on any matter presented at the forthcoming December Special Meeting of Stockholders, including the anticipated proposal to authorize a reverse stock split. On the same day, the Company sold a single share of Series AA Preferred Stock to Defendant Michery for $25,000. Defendant New executed the stock purchase agreement on the Company's behalf. Through this maneuver, the Individual Defendants effectively secured the power to override the will of the common shareholders, even if they opposed the reverse stock split.

159.   This arrangement gave Defendant Michery complete control over the voting outcomes at the December Special Meeting of Stockholders, allowing him to influence the proposals however he chose. Moreover, the terms of the Series AA Preferred Stock allowed Defendant Michery to redeem the share and recover the $25,000 once the reverse stock split proposal had passed.

160.   On September 7, 2022, the SEC notified Mullen that its stock had traded below $1.00 for 30 consecutive business days, placing the Company out of compliance with NASDAQ's listing standards. Mullen was initially given 180 days, until March 6, 2023, to regain compliance.

161.   On November 15, 2022, the Company announced that a Special Meeting of Stockholders would be held on December 23, 2022. The agenda included several proposals: (a) authorization for the Company to effect a reverse stock split; (b) an increase in the number of authorized shares of common stock to five billion; (c) a change in the Company's state of incorporation from Delaware to Maryland; and (d) authorization for the issuance of $150 million in notes and up to $190 million in additional Series D Preferred Stock, each convertible into common stock and accompanied by warrants exercisable for common stock.

162.   On that same day, through an amendment to a prior stock purchase agreement originally executed on June 7, 2022, Mullen entered into an agreement to sell a $150 million convertible note to Esousa Holdings, LLC, Acuitas Capital, LLC, TDR Capital Pty Limited, BitNile Holdings, Inc., Jess Mogul, Jim Fallon, and Michael Friedlander. The note carried an annual interest rate of 15%, and upon conversion of the note into shares of common stock, the investors were entitled to receive warrants exercisable for 185% of the corresponding number of common shares.

163.   On November 21, 2022, Mullen announced that it was registering and authorizing the resale of up to 220,828,539 shares of common stock by Favored Investors, pursuant to the exercise of warrants and the conversion of notes.

164.   Subsequently, on December 23, 2022, the shareholder vote on the proposed measures was postponed to a Special Meeting of Stockholders scheduled for January 19, 2023. At that meeting, with Defendant Michery voting in favor, the proposal to authorize a reverse stock split was approved.

165.   Defendant Michery, along with other Mullen shareholders, also voted to approve an issuance of $150 million in notes and a maximum of an additional $190 million shares of Series D Preferred Stock. In effect, this action approved an increase in Mullen's authorized capital stock from 2.25 billion to 5.5 billion shares, thereby enabling the Individual Defendants to issue and sell more shares to investors. This influx of capital could then be used to support the extravagant lifestyles of Defendant Michery and his associates. With this objective achieved, Defendant Michery redeemed his single share of Series AA Preferred Stock for $25,000, and the Company subsequently filed a certificate with the Delaware Secretary of State, formally canceling the Series AA Certificate of Designation and eliminating the Series AA Preferred Stock in its entirety.

166.   In the wake of this shareholder vote, news outlets commented on the ludicrous increase of authorized shares, particularly since it would effectively allow the Company to immediately profit from the reverse stock split. David Shultz, a writer for dot.LA, wrote an article entitled, "Mullen Approves Reverse Split, Punts Dilution Vote to Next Week Due to Ongoing Lawsuit." In that article, he stated:

> The really wild thing here is that the reverse split doesn't impact how many shares Mullen can issue. Mullen currently has 1.7 billion outstanding shares. So for example, if the company decided to reverse split at 1-for-10, the total number of shares would drop to 170 million. You might think that this means the company could only increase the authorized stock to 500 million instead of 5 billion, but that's not the case. Despite this 10-fold reverse split, Mullen could still increase the number of authorized shares to 5 billion (if the vote passes and the courts agree this is all legitimate).

167.   As the March 6, 2023 compliance deadline approached and Mullen's stock remained below $1.00, the Company requested a 180-day extension, pushing the deadline

to September 5, 2023. To secure this extension, the Individual Defendants publicly committed to avoiding a reverse stock split before September 6, 2023, presenting this as a show of good faith and sound governance.

168.   On March 6, 2023, Mullen announced that it was registering and authorizing the resale of up to 522,222,223 shares of common stock to Acuitas Capital LLC, pursuant to the exercise of warrants and preferred stock.

169.   On March 8, 2023, Mullen was granted a 180-day extension, until September 5, 2023, to comply with NASDAQ's $1.00 Bid Price Requirement. This followed a prior notice from NASDAQ in September 2022, which had given Mullen until March 6, 2023 to meet the minimum bid price. The extension was granted in light of the Individual Defendants' representations that no reverse stock split would occur before September 6, 2023. However, both NASDAQ and retail investors would later come to understand that the Individual Defendants had, in fact, always intended to implement a reverse stock split well before that stated deadline.

170.   On April 3, 2023, the parties to the June 7, 2022 stock purchase agreement executed an amendment in which the Company agreed to issue additional Series D Preferred Stock and warrants in exchange for two payments of $45 million, due on April 17, 2023 and May 15, 2023. As part of the amendment, the Company also agreed not to execute a reverse stock split during the five trading days immediately preceding either payment date.

171.   On April 14, 2023, Mullen announced that it was registering and authorizing an additional 2,115,000,000 shares of common stock for resale by Favored Investors, pursuant to the exercise of warrants and conversion of notes. This arrangement allowed Favored Investors to profit by quickly reselling their shares, while providing Mullen with a cash infusion through the warrant exercises.

172.   On May 4, 2023, the Individual Defendants carried out the first reverse stock split during the Relevant Period.

173.   However, following this stock split, as discussed above, the Individual Defendants were able to generate significant investor enthusiasm through the announcement of new deal in which the Company would supposedly generate significant business.

174.   Favored Investors capitalized on the renewed investor enthusiasm by exercising their warrants and convertible notes. In June 2023, the Individual Defendants registered shares for resale on three separate occasions in connection with those exercises. On June 5, 2023, Mullen registered and authorized up to 242,124,674 shares of common stock for resale by Favored Investors. On June 12, 2023, the Company registered and authorized up to 585,937,467 additional shares for resale. Finally, on June 26, 2023, Mullen registered and authorized up to 2,335,128,757 shares of common stock for resale. Each of these registrations corresponded directly to shares issued to Favored Investors through the exercise of warrants and the conversion of convertible notes.

175.   On August 11, 2023, the Individual Defendants executed their second reverse stock split during the Relevant Period.

176.   On October 27, 2023, Mullen registered and authorized up to 103,009,651 shares of common stock for resale by Favored Investors, pursuant the exercise of warrants and convertible notes.

**The Cycle of Stock Purchase Agreements and Stock Splits Continues**

177.   On May 14, 2024, Mullen strengthened its cash reserves by entering into a stock purchase agreement under which the Company agreed to sell convertible notes and warrants to Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., Jim Fallon, Jess Mogul, Michael Friedlander, Phil Bannister, Matthew Krieger, and Mario Silva in exchange for $52.6 million.

178.   Throughout the spring and summer of 2024, Mullen continued to register large volumes of additional shares for resale by Esousa Holdings and other Favored Investors, tied to the exercise of warrants and the conversion of convertible notes. On May

20, 2024, Mullen registered and authorized up to 20,000,000 shares of common stock for resale. On July 5, 2024, it registered and authorized up to 75,000,000 additional shares for resale. And on July 26, 2024, it registered and authorized up to 85,000,000 more shares, also for resale by Favored Investors.

179.  According to CW1, by mid-July 2024, it was widely understood within Mullen that none of the Company's vehicles complied with the UAE's homologation standards. Homologation is the process of certifying that a vehicle meets a specific market's regulatory and safety requirements. In the UAE, all EVs must be certified by the Emirates Authority for Standardization & Metrology, which enforces technical standards related to electrical performance, electromagnetic compatibility, and general safety.

180.  Critically, Mullen's vehicle batteries were not designed to withstand the UAE's extreme heat and therefore failed to meet the required standards.

181.  On August 26, 2024, the Company announced a announcing a purchase agreement between the Company and Volt Mobility for approximately $210 million

182.  Following the Volt Mobility announcement, Mullen disclosed yet another authorization and registration of common stock tied to the exercise of warrants and conversion of convertible notes. On September 6, 2024, the Company registered up to 350,000,000 shares of common stock for resale pursuant to these financial instruments.

183.  Despite the misleading nature of the Volt Mobility announcements, Mullen's stock once again fell below the NASDAQ's $1.00 minimum bid requirement. On September 13, 2024, Mullen announced a 1-for-100 reverse stock split, set to take effect on September 17, 2024.

184.  On October 4, 2024, Mullen registered for resale up to 30,000,000 shares of common stock.

185.  On January 23, 2025, Mullen entered into a new securities purchase agreement with Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., and TD Capital No. 1 Pty Limited. Under this agreement, the Company issued $6.3 million in convertible notes

and warrants. The notes were convertible into common stock at the lower of: (i) $23.60 per share, (ii) 95% of the stock's closing price on the date a subsequent registration statement became effective, or (iii) 95% of the lowest daily volume-weighted average price during the five trading days prior to conversion—subject to a minimum price of $0.08 per share. Additionally, Esousa Holdings, LLC, JADR Capital 2 Pty Ltd., and TD Capital No. 1 Pty Limited retained rights to purchase up to an extra $6.3 million in notes and warrants. The warrants could also be exercised on a cashless basis using a formula with a floor price of $0.01 per share.

186.   On January 29, 2025, the Company registered for resale up to 50,000,000 shares of common stock issued to Favored Investors upon exercise of warrants and conversion of convertible notes.

187.   On February 5, 2025, Mullen entered into another securities purchase agreement with Esousa Holdings, LLC and JADR Capital 2 Pty Ltd., under which the Company agreed to sell $3.1 million in warrants and convertible notes.

188.   On February 13, 2025, Mullen announced via press release a 1-for-60 reverse stock split, set to take effect on February 18, 2025.

189.   On March 4, 2025, Mullen registered for resale up to 10,000,000 shares of common stock to be issued to Favored Investors through the exercise of warrants or the conversion of convertible notes.

190.   On March 6, 2025, Mullen entered into another securities purchase agreement with Esousa Holdings, LLC and TD Capital No. 1 Pty Limited, agreeing to sell $4 million in principal amount of convertible notes and accompanying warrants in exchange for $3.8 million.

191.   On May 16, 2025, Mullen further strengthened its cash reserves by entering into another securities purchase agreement with Esousa Holdings, LLC. Under the agreement, the Company agreed to sell $1,578,947.37 in principal amount of convertible notes, along with additional warrants, in exchange for $1.5 million in proceeds.

192.   Then, on May 29, 2025, Mullen executed two additional securities purchase agreements. In the first, the Company partnered with Esousa Holdings, LLC and TD Capital No. 1 Pty Limited to sell $11,578,947.37 in principal amount of convertible notes, plus accompanying warrants, in exchange for $11 million. In the second, Mullen entered into a separate agreement with TD Capital No. 1 Pty Limited, selling $2,715,789.47 in principal amount of convertible notes and additional warrants in return for $2.58 million.

193.   Then, on April 9, 2025, the Company issued a press release announcing a 1-for-100 reverse stock split, which took effect on April 11, 2025.

194.   On May 29, 2025, Mullen issued a press release announcing a 1-for-100 reverse stock split, its seventh of the Relevant Period, set to take effect on June 2, 2025.

**False and Misleading Statements**

***January 25, 2023 Press Release***

195.   On January 25, 2023, even with approval by the shareholders, the Company announced it "has no plans at the current time to effect a reverse split." The Individuals Defendants put out a press release in order to assuage investors that a reverse split would not dilute common shareholders (the "January 25th Press Release").

196.   The January 25th Press Release stated, in relevant part:

> ***The company has no plans at the current time to effect a reverse split. The company has until March 6, 2023 to meet the Nasdaq minimum bid requirement of $1.00. If the share price of the company's stock falls short of the said requirement, the company intends to seek an extension from NASDAQ to meet the required threshold. If such extension is granted, compliance of the minimum $1.00 stock share threshold requirement may be extended for a further 180 days until approximately September 6, 2023. If the company still falls short of the minimum bid requirement, it will effect a reverse stock split at that time to maintain its Nasdaq listing compliance.*** Mullen is also a member of the Russell 2000 Index through June of 2023, which requires a minimum stock price of $1.00 for inclusion. The Russell Index will rebalance in June of 2023, at which time, if the share price of the company's stock falls short of the minimum $1.00 threshold required, Mullen will evaluate if it is in the best interest of shareholders to initiate a reverse stock split for continued inclusion in the Russell 2000 index.

***February 14, 2023 1Q23 10-Q and Earnings Press Release***

197.    On February 14, 2023, Mullen filed its Form 10-Q with the SEC for the quarter ended December 31, 2022 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Michery and New and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Michery and New attesting to the accuracy of the 1Q23 10-Q and that "the information contained in the [1Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

198.    The 1Q23 10-Q reinforced Defendant Michery's earlier misstatements from January 25, 2023, asserting that the company had no plans to implement a reverse stock split prior to September 6, 2023:

> ***At the Special Meeting of Mullen Shareholders held on January 25, 2023, in order to meet NASDAQ listing requirements, a proposal for implementation of a reverse stock split was approved, which the company does not plan to enact in the event the stock eclipses the $1 mark between now and September 6th.*** Should the price of the Mullen common stock not reach $1 per share, management plans to implement the reverse split at a magnitude determined at that time.

199.    That same day, the Individual Defendants issued a press release announcing its financial results for the first quarter 2023 in conjunction with the 1Q23 10-Q (the "1Q23 Press Release"). The 1Q23 Press Release reiterated that the Company had no plans to effect a reverse stock split until September 6, 2023, stating:

> Concerning the Special Meeting of Mullen Shareholders, after removing certain items initially slated for consideration by Shareholders, all remaining proposals were approved. ***This included the implementation of a reverse stock split, which the company does not plan to enact in the event the stock eclipses the $1 mark between now and September 6th.*** Should the price of the Mullen common stock not reach $1 per share, management plans to implement the reverse split at a magnitude determined at that time.

200.   The statements in ¶¶195-200 were materially false and misleading at the time they were made because: (1) the Individual Defendants knew that additional reverse stock splits would be necessary and intended to implement them as needed to maintain the Company's NASDAQ listing, yet made the statements to secure a 180-day extension from NASDAQ to comply with its $1.00 Bid Price Requirement; (2) the Individual Defendants had already planned to carry out as many reverse stock splits as required to preserve the listing; (3) the statements falsely implied that no additional reverse stock splits were anticipated; and (4) the statements omitted the material fact that, due to Mullen's lack of any viable business prospects in manufacturing and selling EVs, the Individual Defendants were aware that further dilutive offerings and reverse stock splits would be pursued.

### *April 18, 2023 Press Release*

201.   On April 18, 2023, the Company issued a press release announcing a joint venture between Mullen and Global EV Technology, Inc. and EV Technologies LLC (collectively, "EVT") (the "EVT Press Release"). The joint venture would create a new entity called MAEO, which would purportedly advance energy management technologies, beginning with EVs and then reaching other energy applications. The EVT Press Release stated that Mullen would own 51% of MAEO and that MAEO would "consolidate the results of [MAEO's] operations in Mullen." With the creation of this new subsidiary, Hardge became the Senior Vice President of Technology for MAEO, effectively operating as an agent of the Company.

202.   The EVT Press Release also stated that Mullen and EVT would "be contributing and working together on known verified technology for improving existing vehicle performance and extending battery range. As this technology has immediate and key implications for electric vehicles, MAEO['s] initial development is focused on improving Mullen's lineup of commercial and consumer EVs." The EVT Press Release further touted Hardge as a successful life-long inventor, but it also noted that he "was convicted of a state crime" in the late 1990s, "and ultimately it was expunged."

203.   The above statements in ¶¶ 201-202 were materially false and misleading when made because: (1) The battery technology in question was not a "known, verified technology for improving existing vehicle performance and extending battery range," but rather a fictitious invention allegedly developed by Hardge, which did not actually exist; and (2) contrary to claims that Hardge had only been "convicted of a state crime," which was ultimately expunged, he had, in fact, been convicted of a felony for selling unregistered securities, and that conviction was never expunged.

### *April 20, 2023 Press Release*

204.   Two days later, on April 20, 2023, the Company issued a press release (the "April 20th Press Release") to announce the first test results of the MAEO battery and "exciting and groundbreaking test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range." In relevant part, the April 20th Press Release stated:

- ***Element Materials Technology test results indicate that the Energy Management Module ("EMM") technology substantially increases the driving range and efficiency of any current EV battery.***

- Specific vehicle testing of a high-volume OEM electric vehicle by Element resulted in a calculated increase in range from 269 to 431 miles, which is a 60% increase in efficiency.

- EMM technology was also tested by Mullen Automotive engineers on the Company's Class 1 EV Cargo Van at its Troy, Michigan, facility. Results showed more than a 75% increase in range for the 42-kWh lithium-ion battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass.

- EMM technology is being integrated into final stages of product development and is planned to be introduced in all Mullen commercial and consumer vehicle programs.

- U.S. provisional patent application has been filed covering the technology.

- Mullen Automotive owns 51% of MAEO, LLC and will consolidate the

results of its operations in Mullen Automotive, Inc. (NASDAQ: MULN)

205.   In addition, the press release quoted Defendant Michery, who stated, *inter alia*, that "[s]eeing the previous EMM test results conducted by Element, along with Global EVT testing, and ***correlating that with testing by our engineers***, we believe this technology is a perfect fit for Mullen's EV product lineup as well as the advancement in EV technology for the overall automotive industry." The April 20th Press Release also indicated that MAEO was "plan[ning] on licensing this technology to anyone who uses an electric vehicle."

206.   The statements in ¶¶ 204-205 were materially false and misleading because, as was later revealed: (1) the battery technology described did not "substantially increase[] the driving range and efficiency of any current EV battery," but was instead a fictitious invention allegedly created by Hardge; (2) no existing technology is capable of boosting a battery pack like the one used by EVT to achieve a range of 431 miles; (3) Element Materials Technology did not validate the EMM's technological capabilities, but rather reported that it reached "no conclusion" regarding the EMM's ability to enhance battery performance or range; and (4) Mullen never independently verified Global EVT's testing results through testing conducted by its own engineers.

### April 20, 2023 Facebook Live

207.   On April 20, 2023, Hardge went on Facebook Live to announce that Mullen and EVT had entered into a deal worth $10 billion with Saudi Arabia. Hardge specifically stated the following, in relevant part:

> ***This is not what somebody said or what you heard, this is reality. $10 billion contract with Saudi Arabia. And more to come*** … Mullen and Lawrence Hardge are here to assist them, they have countries like Yemen, Israel, all of them have joined in to take this technology, and they're going to produce it in Saudi Arabia and they're also paying for a manufacturing plant to come to Michigan.

208.   This statement was materially false and misleading because: (1) the

technology allegedly sold to Saudi Arabia was entirely fictitious, fabricated by Hardge and did not actually exist; (2) consequently, neither MAEO nor Mullen had any realistic prospect of generating $10 billion in revenue from Saudi Arabia; and (3) even if the technology were real, Hardge's agreement with Mullen included a carve-out for Saudi Arabia, meaning any supposed deal between Hardge and Saudi Arabia would not benefit or involve Mullen in any way.

209.   On this news, the Company's stock price surged by 25.6%, rising from a closing price of $0.084 on April 20, 2023, to a high of $0.113, before settling at $0.102 at the close of trading on April 21, 2023.

210.   Further, news outlets took note of the Company's progress. In James Rogers' article entitled, "After TOP Financial's surge, influential meme-stock trader looks for next big opportunity," he stated that Mullen was making great deals and partnerships and its stock "has seen a dramatic spike in trading volume recently, with an average of over 567 million shares over the last five days, according to FactSet data. The stock's 65-day average trading volume is 270.3 million shares."

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*May 3, 2023 Reverse Stock Split*

211.   Despite a series of false announcements about alleged deals and technological advancements, Mullen's stock price again fell well below the NASDAQ's $1.00 minimum bid requirement. As a result, on May 3, 2023—less than two months after assuring investors that it had no intention of executing a reverse stock split—Mullen announced it would carry out a 1-for-25 reverse stock split the following day, consistent with its apparent pattern of doing so when the share price declined.

212.   On this news, Mullen's stock dropped 30.2%, falling from an opening price of $0.086 to a low of $0.06, and closing at $0.063 that same day. However, the Individual Defendants continued to obfuscate the truth.

*May 15, 2023 Press Releases*

213.    On May 15, 2023, in an attempt to restart investor interest and boost the stock following the reverse split, the Company issued a press release highlighting testing of its Energy Management Module ("EMM") technology, claiming that results "show[ed] an increased battery capacity of 44%" (the "EMM Press Release").

214.    The EMM Press Release stated, in relevant part:

On April 18th, 2023, the Company announced the formation of Mullen Advanced Energy Operations ("MAEO"), a collaboration with Global EV Technology, Inc. ("Global"), with initial development focused on improving energy management technology in electric vehicles for greater range and vehicle performance.

215.    The statements in ¶¶ 213-214 were materially false and misleading at the time they were made because: (1) the battery technology promoted by EVT and Mullen did not, in fact, increase battery capacity by 44%; (2) the testing could not have verified such a claim, as the technology in question did not actually exist; and (3) both the technology and the alleged testing were fabrications created by Hardge.

216.    Additionally, on May 15, 2023, Mullen issued a related press release intended to generate investor excitement, promoting a $680,000 deal that Mullen and EVT had supposedly secured with the city of Washington, D.C. (the "May 15th Washington Press Release").    The May 15th Washington Press Release omitted the critical fact that the contract was based on delivering non-existent technology that the Individual Defendants did not actually possess, stating:

Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, today issues an update on the pilot program contract for installation of Energy Management Modules ("EMM") on Washington, D.C., city government's fleet of vehicles. The $680,000 contract was previously awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC. for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet. Mullen Advanced Energy Operations ("MAEO") is supporting EV Technologies for the execution of the contract, which started on April 24,

2023. MAEO, which is a 51%-owned subsidiary of Mullen Automotive, is a collaboration with Global EV Technology, Inc. ("Global"). MAEO has named Lawrence Hardge to the position of Senior Vice President of Technology. Lawrence will be overseeing all technological aspects of the Energy Management Module ("EMM") applications.

"We look forward to completing our installation work here in D.C., and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC. "As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive.

217. The statements in ¶ 216 were materially false and misleading because they omitted key adverse facts necessary to render the statements not misleading, including: (1) the technology allegedly sold to the city of Washington, D.C. did not exist and was instead a fabrication created by Hardge; (2) as a result, neither MAEO nor Mullen had any realistic chance of generating $680,000 in revenue from the city of Washington, D.C.; and (3) there were no additional "opportunities with local and federal government agencies," as suggested. As a result, these misleading announcements were strategically issued to reignite investor interest in Mullen following the Company's first reverse stock split during the Relevant Period.

### May 15, 2023 2Q23 10-Q

218. On May 15, 2023, Mullen filed its Form 10-Q with the SEC for the period ended March 31, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendants Michery and New and attached SOX certifications signed by Defendants Michery and New attesting to the accuracy of the 2Q23 10-Q and that "the information contained in the [2Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

219. Regarding the deal with EVT, the 2Q23 10-Q stated, in pertinent part:

On April 17, 2023, the Company entered into a binding Letter of Agreement with Lawrence Hardge, Global EV Technology, Inc., and EV Technology,

LLC to partner on a device known as a Battery Life Enhancing Technology. The parties will form a new corporation called Mullen Advanced Energy Operations to develop, manufacture, market, sell, lease, distribute, and service all products resulting from the technology. The Company will hold a 51% equity interest in MAEO, and EVT will hold a 49% equity interest. EVT will license the technology and intellectual property rights to MAEO and assign all rights to governmental and other contracts relating to the technology. The Company will pay Mr. Hardge an upfront payment of $50,000 and then $5.0 million upon execution of definitive agreements and completion of IP assignment. The Company will also fund up to $5.0 million for all MAEO business operations, with additional funding based on a budget reasonably approved by the parties.

220. The statements in ¶¶ 218-219 were materially false and misleading when made because: (1) MAEO did not possess any technology capable of "enhancing battery life"; and (2) the statements failed to disclose that the alleged battery technology forming the basis of the EVT and Mullen partnership was entirely fabricated by Hardge.

### June 6, 2023 Financial Journey Interview

221. On June 6, 2023, during an interview on the YouTube channel *Financial Journey*, Defendant Michery finally addressed the supposed Saudi Arabia deal. He acknowledged that Hardge had a carve-out in his agreement, and that any alleged arrangement with Saudi Arabia had "no impact" on Mullen. Defendant Michery further admitted he had never reviewed any documentation related to that deal. In doing so, he stated he was providing this clarification because "misrepresentations [were] being made," and acknowledged that Mullen "knew" Hardge's statements were not accurate.

222. Defendant Michery also conceded that—contrary to Mullen's earlier claims—the Company had never independently verified the testing results that supposedly supported the "groundbreaking" EMM technology. In relevant part, he stated:

So, keep in mind, between January 4th of this year and January 20th, we had Lawrence at our facilities in Troy, Michigan, testing this EMM module. And Lawrence would provide us data, showing that these units performed at whatever level that we had advertised, were the results provided by Lawrence. We had asked that we wanted to have these units independently tested by a

EPA certified test facility in Michigan. [Lawrence Hardge] agreed to do that on April 21st. And those vehicles have been sitting at the EPA test facility in Michigan, waiting for him to provide those units. We're told time in, and over and over again, that he's going to provide the units, provide the units. And those vehicles have been sitting... both class one and class three, have sat at that facility now for well over a month, maybe more. And again, waiting to run these EPA certified tests so we could validate the unit as a condition to closing. So, as of this date, there's been no response to that.

223.   On this news, Mullen's stock dropped 22.7%, falling from an opening price of $0.665 to a low of $0.506 over the next two trading days, and closing at $0.517 on June 7, 2023. However, the Individual Defendants continued to obfuscate the truth.

224.   For example, in the same interview, Defendant Michery stated that he believes in Hardge as a person and that he is a "great inventor," continuing to provide investors with hope and excitement that the Individual Defendants' claim for "groundbreaking" technology was accurate.

### June 8, 2023 Jalopnik.com Article

225.   Then, on June 8, 2023, the first concrete evidence emerged that the Individual Defendants' claims of "groundbreaking" technology were false. An article published by *Jalopnik.com* exposed critical omissions in Hardge's exaggerated assertions. The article revealed that EVT's testing had been conducted on a small, golf cart–style EV, similar to those used by retirees in Florida, rather than on a "top EV" as Hardge had claimed. The article also stated that the test was conducted "without the drive wheels touching the ground," meaning it had no relevance to real-world driving conditions where friction impacts battery performance.

226.   On this news, the Company's stock price fell 60.5%, falling from an opening price of $0.509 to a low of $0.201 over the next five trading days, before closing at $0.261 on June 15, 2023. However, the Individual Defendants continued to obfuscate the truth.

### July 10, 2023 EVT Partnership Termination

227.   On July 10, 2023, Mullen announced the termination of its partnership with

EVT and therefore Hardge. The Individual Defendants represented that the partnership ended since the Company had never verified technical claims made by Hardge, MAEO and Mullen, or MAEO's license to the purported technology. The announcement stated, in relevant part:

> On July 10, 2023, Mullen Automotive Inc. (the "Company" or "Mullen"), issued a termination notice to Lawrence Hardge and the following entities Global EV Technology, Inc. and EV Technology, LLC (collectively, "EVT") terminating the Agreement dated April 17, 2023 between the Company and EVT. Pursuant to the Agreement, the parties agreed to jointly form and organize Mullen Advanced Energy Operations ("MAEO") to develop, manufacture, market, sell, lease, distribute and service all products resulting from a device that is designed to extend the effective battery life (the "Technology") and EVT would agree to license to MAEO the Technology and all intellectual property rights relating to the Technology.

> The termination notice, which was sent after numerous attempts by the Company to obtain adherence by EVT to the terms of the Agreement, references several breaches by EVT including (1) failing to execute documents evidencing an irrevocable, royalty free, worldwide exclusive license to the Technology and IP, in perpetuity, to MAEO, (2) refusing to conduct any tests of the Technology at a Mullen approved facility after the LOA, (3) repeatedly refusing to honor the terms of the Mutual Non-Disclosure Agreement signed April 14, 2023, and (4) failing to disclose all claims or threatened legal actions by any third parties related to the Technology.

228.   On this news, the Company's stock fell 3.2%, dropping from an opening price of $0.182 to a low of $0.176 on July 10, 2023. However, the Individual Defendants continued to obfuscate the truth.

### *July 10, 2023 Proxy Statement*

229.   On July 10, 2023, the Company filed its Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Michery. Winter, Novoa, Puckett, Betor, Miltner, and Andersen solicited the 2023 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

230.   The 2023 Proxy Statement called for the Company's shareholders to vote to,

*inter alia*: (1) re-elect Defendants Puckett and Betor; (2) approve amendments to the Company's 2022 Equity Incentive Stock Plan to increase the number of shares of Common Stock authorized for issuance (the "Amended 2022 Plan"); (3) approve the amendment of the Company's Second Amended and Restated Certificate of Incorporation ("COI") to effect a reverse stock split; (4) approve, on an advisory basis, the compensation of the Company's named executive officers; (5) select, on an advisory basis, whether future advisory votes on the compensation of the Company's named executive officers should be every one, two or three years; (6) approve of the issuance of shares of Common Stock to the CEO pursuant to a Performance Stock Award Agreement; (7) approve amendments to a securities purchase agreement to provide for the issuance of $7 million in additional shares of Common Stock and warrants exercisable into shares of Common Stock; and (8) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the 2023 Fiscal Year.

231.   The 2023 Proxy Statement explains that the Amended 2022 Plan would increase the aggregate number of shares authorized for issuance under the existing plan by 52,000,000 shares. As such, upon approval of the Amended 2022 Plan, the maximum number of shares of common stock that may be issued is 643,376,440. As of June 22, 2024, there were 591,376,440 shares of common stock available for grant under the plan. The 2023 Proxy Statement noted that if the Mullen shareholders approved the Amended 2022 Plan, "[e]mployees, directors, and third party service providers are eligible to receive awards, although third party service providers and outside directors are not eligible for incentive stock options." Further, the Amended 2022 Plan awards stock options (both incentive and non-statutory options), stock appreciation rights, restricted stock, restricted stock units, and performance-based awards.

232.   Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement provided the following, in relevant part:

The Board as a whole is responsible for consideration and oversight of the

risks we face and is responsible for ensuring that material risks are identified and managed appropriately. Certain risks are overseen by committees of the Board and these committees make reports to the full Board, including reports on noteworthy risk-management issues. Members of the Company's senior management team regularly report to the full Board about their areas of responsibility and a component of these reports is the risks within their areas of responsibility and the steps management has taken to monitor and control such exposures. Additional review or reporting on risks is conducted as needed or as requested by the Board or one of its committees.

233.    Regarding the Company's Code of Ethics, the 2023 Proxy Statement provided:

We have adopted a Code of Business Conduct and Ethics. This code of ethics applies to our directors, executive officers and employees. This code of ethics is publicly available in the corporate governance section of the Investor Relations page of our website located at https://investors.mullenusa.com /governance#governancedocuments and in print upon request to the Secretary at Mullen Automotive Inc., 1405 Pioneer Street, Brea, California, 92821. If we make amendments to the code of ethics or grant any waiver that the SEC requires us to disclose, we will disclose the nature of such amendment or waiver on our website.

234.    Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, MAEO and Volt Mobility; (2) the Company overstated its battery technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements; and (6) Individual Defendants' participation in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

235.   The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

236.   As a result of Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen causing the 2023 Proxy Statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Puckett and Betor, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve amendments to the Company's Amended 2022 Plan to increase the number of shares of Common Stock authorized for issuance; (3) approve the amendment of the Company's Second Amended and Restated COI to effect a reverse stock split; (4) approve, on an advisory basis, the compensation of the Company's named executive officers; (5) select, on an advisory basis, whether future advisory votes on the compensation of the Company's named executive officers should be every one, two or three years; (6) approve of the issuance of shares of Common Stock to the CEO pursuant to a Performance Stock Award Agreement; (7) approve amendments to a securities purchase agreement to provide for the issuance of $7 million in additional shares of Common Stock and warrants exercisable into shares of Common Stock; and (8) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the 2023 Fiscal Year.

237.   As a result of the shareholders approving the Amended 2022 Plan, an additional 52,000,000 shares were made available for disbursement, allowing for a total of 643,376,440 shares. As such, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Amended 2022 Plan in the future.

*July 17, 2023 WUSA9 News Report*

238.   On July 17, 2023, after Mullen publicly announced it had terminated its relationship with Hardge, Washington, D.C. news outlet *WUSA9* published a report revealing that the technology touted by the Individual Defendants in their April 20th Press Release and May 15th Washington Press Release was "untested and practically impossible," according to engineers (the "WUSA9 News Report"). The WUSA9 News Report detailed how electrical engineering labs at the University of Maryland confirmed that no such technology existed that could achieve what Hardge and Mullen had claimed. The associate director of the Maryland Energy Innovation Institute was quoted as saying: "There's not technologies that I'm aware of that can really boost that same battery pack to significantly more than 200 mile range . . . . There's a variety of limitations just from basic chemical theory. There's only so much energy you can store for the materials that you put into a battery."

239.   The WUSA9 News Report also revealed that Hardge's criminal background was far more serious than Mullen had represented. Contrary to the Company's claim that Hardge had only been convicted of "a state crime, which was ultimately expunged," the report detailed that Hardge was actually sentenced to 26 years in prison following a 2001 felony conviction for selling unregistered securities in Mississippi. The WUSA9 News Report also stated that Hardge served five years in prison and later sought to have his record expunged in 2021. However, in March 2022, a "Mississippi judge rescinded Hardge's temporary felony expungement in March 2022, after a judge's order shows allegations surfaced that Hardge used a business investor's money to repay the people he defrauded in 2001." As a result, at the time Mullen issued its EVT Press Release, Hardge was, in fact, a convicted felon.

240.   On this news, the Company's stock price fell 11.7% over the next two trading days, from an opening price of $0.162 on July 17, 2023, to a low of $0.143, before closing at $0.147 on July 19, 2023.

*July 22, 2023 Carscoops Report*

241.   On July 22, 2023, *Carscoops.com* reported that the City of Washington, D.C. had canceled the $680,000 contract Mullen had promoted to investors in its May 15th Washington Press Release.

242.   On this news, the Company's stock price fell 18% over the following three trading days, from an opening price of $0.15 on July 21, 2023, to a low of $0.123, and closing at $0.13 on July 26, 2023.

*August 7, 2023 WUSA9 Report*

243.   Then, on August 7, 2023, *WUSA9* published a follow-up investigation into Hardge and his fictitious technology. The report reiterated engineers' conclusions that the technology did not, and could not, exist. It also included a statement from Element Materials Technology, which clarified that, contrary to claims made by Mullen and Hardge, the firm had reached no conclusion about the EMM technology's effectiveness in enhancing the driving range or efficiency of any current EV battery.

*August 10, 2023 Reverse Stock Split*

244.   Aware that Mullen's stock price had plunged following the exposure of false claims surrounding the EVT technology, the Individual Defendants turned once again to reverse stock splits in an effort to artificially boost the share price. On August 10, 2023, Mullen announced it would implement a 1-for-9 reverse stock split, effective the following day.

245.   On this news, the price of the Company's stock fell 6.9%, from an opening price of $0.115 to a low of $0.107, before closing at $0.113 on August 10, 2023. However, the Individual Defendants continued to obfuscate the truth.

*August 23, 2023 Shareholder Letter*

246.   Then, on August 23, 2023, following the August reverse split, Defendant Michery issued an open letter to shareholders. In the letter, he claimed he was fully committed to Mullen's success and that the Company's stock price did not reflect its true

value.

247.   Defendant Michery stated, in relevant part:

I am very disappointed by the performance of our stock. As I have previously publicly stated, I do not believe the trading price of our stock even closely resembles the Company's actual value. It is evident that, regardless of meeting significant corporate milestones (i.e., vehicle production completion within projected timelines), stock traders continue to place downward pressure on the stock, causing the price to fall.

I previously announced that the Company engaged Share Intel and other parties to investigate what I suspect to be unlawful trading practices in our stock. We are assembling all the data received to date and should have something to announce in the coming days.

I am extremely frustrated that the hard work of Mullen's dedicated team and the significant momentum and successes achieved to date are overshadowed by the unrealistic value attributed to our stock. The Company and I have demonstrated our commitment to the success of our initiatives by purchasing its stock through the previously announced Share Buy Back program. I have also personally recently purchased stock, demonstrating my unwavering confidence in our Company.

248.   The statements in ¶¶ 246-247 were materially false and misleading when made because: (1) Defendant Michery was well aware that, due to the Company's exaggerated and misleading claims about various deals and technologies, Mullen's stock price was significantly inflated compared to where it would be if investors had been given the truth.

***December 19, 2023 Shareholder Letter***

249.   On December 19, 2023, Defendant Michery issued an open letter to shareholders acknowledging that the Company had been given until January 22, 2024, to demonstrate compliance with NASDAQ's $1.00 minimum bid requirement by maintaining that price for at least 20 consecutive trading days, "failing which the Company would be ***permanently delisted*** from the Nasdaq capital markets." He admitted that the "***only***" viable

path to regaining compliance was to implement a "***significantly large reverse stock split***." The letter also conceded that Mullen needed to raise capital and warned that "[***m]ost sources of capital are not willing to provide financing to the Company if it is no longer on a major national exchange***." For, being downgraded to an over-the-counter market, where trading volume and liquidity are far lower, would, according to Defendant Michery, pose a significant risk to both the Company and its shareholders.

250.    Later that same day, Mullen issued a press release announcing a 1-for-100 reverse stock split, effective December 21, 2023.

251.    On this news, the Company's stock price fell 32.4% over the next two trading days, from an opening price of $0.114 on December 19 to a low of $0.077, and closing at $0.08 on December 20, 2023.

### January 19, 2024 Proxy Statement

252.    On January 19, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

253.    The 2024 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Miltner and Andersen to the Board; and (2) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the 2024 Fiscal Year.

254.    Regarding the Board's role in risk oversight, the 2024 Proxy Statement provides the following, in relevant part:

> The Board as a whole is responsible for consideration and oversight of the risks we face and is responsible for ensuring that material risks are identified and managed appropriately. Certain risks are overseen by committees of the Board and these committees make reports to the full Board, including reports on noteworthy risk-management issues. Members of the Company's senior management team regularly report to the full Board about their areas of responsibility and a component of these reports is the risks within their areas

of responsibility and the steps management has taken to monitor and control such exposures. Additional review or reporting on risks is conducted as needed or as requested by the Board or one of its committees.

255.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided:

> We have adopted a Code of Business Conduct and Ethics. This code of ethics applies to our directors, executive officers and employees. This code of ethics is publicly available in the corporate governance section of the Investor Relations page of our website located at https://investors.mullenusa.com /governance#governancedocuments and in print upon request to the Secretary at Mullen Automotive Inc., 1405 Pioneer Street, Brea, California, 92821. If we make amendments to the code of ethics or grant any waiver that the SEC requires us to disclose, we will disclose the nature of such amendment or waiver on our website.

256.    Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, MAEO and Volt Mobility; (2) the Company overstated its battery technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements; and (6) Individual Defendants' participation in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

257.    The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's

descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

258.   As a result of Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen causing the 2024 Proxy statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Miltner and Andersen to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the 2024 Fiscal Year.

### *August 26, 2024 Press Release and X Posts*

259.   On August 26, 2024, Mullen issued a press release announcing a purchase agreement between the Company and Volt Mobility for approximately $210 million (the "Volt Mobility Press Release"). The Volt Mobility Press Release stated, in relevant part:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an electric vehicle ("EV") manufacturer, announced today that Volt Mobility ("Volt"), based in the United Arab Emirates ("UAE"), has entered into a purchase agreement for approximately $210 million to acquire 3,000 Class 1 and Class 3 EV cargo vans and trucks over a 16- month period. Mullen will receive an initial $3 million deposit within 60 days and additional payments as the vehicles are delivered. The Company will begin shipping the first vehicles immediately. Mullen expects to recognize approximately $210 million in revenue over the next 16 months of the agreement. Volt intends to lease these vehicles to its corporate customers based in the Middle East and Gulf States. Current Volt clients include UPS, DHL and FedEx throughout the Gulf Cooperation Council ("GCC") region, which includes Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates (UAE). Volt's vehicle order will be assembled at Mullen's Tunica, Mississippi-based Commercial Vehicle Facility, which is capable of producing 20,000 Class 1 and 6,000 Class 3 vehicles annually with two production shifts.

260.   Following the press release, Defendant Michery further misled the public by posting to his social media that deliveries under the Volt Mobility agreement would "begin

immediately." In a statement made on the social media platform "X," Defendant Michery represented that: "Volt's commercial vehicle order of 3000 Class 1 & 3 EV cargo vans and trucks will be assembled at Mullen's Tunica, Mississippi-based Commercial Vehicle Facility! First round of deliveries to begin immediately!"

261.    Later that same day, Michery posted to X again, referencing the Volt Mobility agreement. In his statement on X, Defendant Michery represented that: "Volt in the UAE has entered into a $210 million agreement to purchase 3,000 of our Class 1 and Class 3 EV cargo vans and trucks over a 16-month period with initial vehicle shipment to begin immediately."

262.    Following this, Michery posted yet again about the Volt Mobility deal, again omitting the critical fact that Mullen lacked the capability to fulfill the agreement, rendering its failure virtually certain. In his post on X, Defendant Michery stated: "Volt is reshaping the way people and businesses move across the UAE and GCC . . . This landmark agreement provides Mullen with exposure to leading global transportation companies and the opportunity for utilizing Mullen EVs across the UAE and other areas of the Middle East."

263.    Ultimately, Defendant Michery re-posted Mullen's statement on X promoting the Volt Mobility deal. The Company's post stated, in relevant part: "Volt Mobility Enters into $210 Million Contract with Mullen Automotive to Purchase 3,000 Class 1 and Class 3 EV Cargo Vans and Trucks."

264.    The statements in ¶¶ 259-263 were materially false and misleading at the time they were made because: (1) Mullen did not, in fact, expect to recognize approximately $210 million in revenue over the following 16 months as claimed; (2) the statements failed to disclose that Mullen's EVs were not compliant with the UAE's homologation requirements, specifically, that the vehicle batteries were not designed to withstand the region's extreme heat; (3) Mullen was aware that it would take roughly one year and $25 million in modifications to bring its vehicles into compliance with UAE standards; and (4)

therefore, Mullen was not in a position to "begin shipping the first vehicles immediately" as stated.

265.    On this news, the Company's stock price surged by 69%, increasing from $0.34 to a high of $0.575.

### September 13, 2024 Reverse Stock Split Announcement

266.    Despite the misleading nature of the Volt Mobility announcements, Mullen's stock once again fell below the NASDAQ's $1.00 minimum bid requirement. On September 13, 2024, Mullen announced a 1-for-100 reverse stock split, set to take effect on September 17, 2024.

267.    On this news, the Company's share price fell 35.7% over the following two trading days, from an opening price of $0.168 on September 13, 2023 to a low of $0.108, before closing at $0.118 on September 16, 2023. However the Individual Defendants continued to obfuscate the truth.

### September 20, 2024 Press Release

268.    On September 20, 2024, in an attempt to reignite investor interest, Mullen issued a press release claiming the delivery of four EVs to the UAE. The press release stated, in relevant part:

Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an electric vehicle ("EV") manufacturer, announces today an update on Volt Mobility's ("Volt") United Arab Emirates ("UAE") recently placed $210 million commercial Class 1 and Class 3 EV order. Mullen's technical and sales team members arrived on site in Dubai this week to meet with Volt's leadership and to support initial market launch activities, including delivery of the first Mullen ONE EV cargo vans and Mullen THREE cab chassis trucks on Sept. 18, 2024.

Mullen recently announced the Volt order to supply 300 all-electric Mullen commercial vehicles in 2024. The Company plans an additional 3,000 vehicles scheduled for delivery in 2025. Additionally, Mullen will establish a parts and service network to support Volt Mobility's fleet operations.

"UAE is a very important market and opportunity for us, and we made sure to

have technical and sales team members in Dubai this week to meet Volt leadership to ensure and kick off a successful launch," said David Michery, CEO and chairman of Mullen Automotive.

\*\*\*

Mullen Automotive, a global EV and technology company, working in conjunction with independent company, VoltiE Group, a U.S.-based EV charging infrastructure company with headquarters in Miami, Florida, are collectively providing EV vehicles and EV charging equipment to Volt Mobility. GCC-based Volt is a vehicle transport and leasing company that offers both commercial electric and gas vehicles and charging throughout the Middle East.

269.   The statements in ¶¶ 268 were materially false and misleading at the time they were made because: (1) the four vehicles shipped to the UAE were intended solely for promotional purposes; (2) were not compliant with the UAE's homologation standards; and (3) as such, could not be legally operated there.

### November 8, 2024 Prospectus

270.   On November 8, 2024, Mullen issued a prospectus amending its registration statement. The prospectus discussed the Volt Mobility deal, stating, in relevant part:

On August 23, 2024, the Company entered into a Purchase Agreement (the "Agreement") with VoltiE Group and Volt Mobility Holding Ltd. ("Volt Mobility") pursuant to which the Company will provide Volt Mobility with commercial electric vehicles ("EVs"), specifically, Class 1 and Class 3 Mullen vehicles and, upon U.S. certification and launch, Bollinger Class 4 vehicles, and chargers at preferred wholesale pricing for the United Arab Emirates ("UAE") region as its exclusive representative. Volt Mobility, as the Company exclusive representative, will have the ability to set up respective dealers and distributors and service partners throughout the region. Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this prospectus, Volt Mobility has not yet made the deposit nor placed the initial orders. The Company also agreed that it will coordinate with Volt Mobility to set up a fully operational service center in the UAE. In the event

of default by any party with respect to any material term and upon 30-day notice, any party may terminate the Agreement in part or in its entirety without any further notice. The Agreement has a term of 16 months and will automatically renew for an additional 12 months unless notice is provided otherwise.

### *January 24, 2025 FY24 10-K*

271.   On January 24, 2025, the Company filed FY24 10-K with the SEC. The FY24 10-K was signed by Defendants Michery, New, Winter, Andersen, Novoa, Puckett, Betor, and Miltner and and attached SOX certifications signed by Defendants Michery and New attesting to the accuracy of the FY24 10-K and that "the information contained in the [FY24 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

272.   The FY24 10-K stated, in relevant part:

In August 2024, we signed a three-year purchase agreement with Volt Mobility, which subsequently assigned the contract to one of its wholly owned companies, Lessor Car Rental LLC. The agreement was for the purchase of Mullen commercial EVs at preferred wholesale pricing for distribution in the United Arab Emirates region as an exclusive representative. VoltiE Group, an independent entity, which was previously described as a subsidiary of the Company in error, agreed to provide chargers. Volt Mobility committed to purchase 3,000 Class 3 commercial EVs with an initial deposit of $3.0 million for initial orders of 300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025. As of the date of this report, Mullen has fulfilled its initial commitment by providing vehicles to support homologation. However, Volt Mobility has not made the deposit nor placed the initial orders. At this time, it is not known if the Company will continue the relationship and is currently investigating alternative distributors for the region.

273.   The statements in ¶¶ 270-272 were materially false and misleading at the time they were made because they omitted critical adverse information necessary to make the claims not misleading, including: (1) Mullen's EVs, specifically the four already delivered, did not meet the UAE's homologation requirements, including that their batteries were not suitable for the region's extreme heat; (2) Mullen was aware it would take approximately

one year and $25 million in upgrades to bring the vehicles into compliance with UAE standards; and (3) given these facts, Mullen had no reasonable basis to claim it could deliver "300 units within 60 days of execution and the balance of 2,700 units in calendar year 2025."

### February 13, 2025 Reverse Stock Split

274. On February 13, 2025, Mullen announced via press release a 1-for-60 reverse stock split, set to take effect on February 18, 2025.

275. On this news, Mullen's stock price declined by 40% over the next two trading days, falling from an opening price of $0.317 on February 13, 2025 to a low of $0.19, and closing at $0.197 on February 14, 2025. However, the Individual Defendants continued to obfuscate the truth.

### February 18, 2025 Proxy Statement

276. On February 18, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. The 2025 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Michery, Novoa, and Winter to the Board; (2) approve the issuance of shares of common stock to the CEO pursuant to amendments to Performance Stock Award Agreements (the "CEO PSA Agreement"); (3) approve an amendment to the Company's 2022 Equity Incentive Stock Plan to increase the number of shares of common stock authorized for issuance under the 2022 Plan by 20,000,000 shares (the "Second Amended 2022 Plan"); (4) approve a second and separate amendment to the 2022 Plan for the adoption of an automatic annual increase in the shares of common stock available for issuance under the 2022 Plan; (5) approve an amendment to the Company's Second Amended and Restated COI to increase the authorized number of shares of preferred stock to 1,000,000,000; (6) approve the amendment of the Company's Second Amended and Restated COI to effect a reverse stock

split; and (7) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the fiscal year ending September 30, 2025 (the "2025 Fiscal Year").

277.    The 2025 Proxy Statement explains that the Second Amended 2022 Plan would increase the aggregate number of shares authorized for issuance under the existing plan by 20,000,000 shares. As of January 31, 2025, there were 11,304,070 shares of common stock available for grant under the plan. As such, following the approval of the Second Amended 2022 Plan, there would be a total of 31,304,070 shares available. The 2025 Proxy Statement noted that if the Mullen shareholders approved the Second Amended 2022 Plan, "[e]mployees, directors, and third party service providers are eligible to receive awards, although third party service providers and outside directors are not eligible for incentive stock options." Further, the 2025 Proxy Statement awards stock options (both incentive and non-statutory options), stock appreciation rights, restricted stock, restricted stock units, and performance-based awards.

278.    The 2025 Proxy Statement explains that the CEO PSA Agreement would issue additional shares of common stock, increasing the number of shares of common stock outstanding, if Defendant Michery achieves certain "Milestones" outlined in the proposal. Should the CEO PSA be approved by stockholders, the Company's stockholders will incur dilution of their percentage ownership upon any issuance of shares of common stock pursuant to the terms of the PSA Agreement. The number of shares to be issued under the PSA Agreements depends on the number of common shares outstanding and the extent to which certain "Milestones" or "Tranches" are achieved, making the exact amount unpredictable. For illustration, 1%, 2%, and 3% of the 61,595,743 shares outstanding as of January 21, 2025, would equate to approximately 616,000, 1.23 million, and 1.85 million shares, respectively, with potential for higher totals if multiple "Milestones" are met. These issuances will dilute existing shareholders' ownership and voting power and may negatively impact the market price of the Company's stock.

279.    Regarding the Board's role in risk oversight, the 2025 Proxy provides, in relevant part:

> The Board as a whole is responsible for consideration and oversight of the risks we face and is responsible for ensuring that material risks are identified and managed appropriately. Certain risks are overseen by committees of the Board and these committees make reports to the full Board, including reports on noteworthy risk-management issues. Members of the Company's senior management team regularly report to the full Board about their areas of responsibility and a component of these reports is the risks within their areas of responsibility and the steps management has taken to monitor and control such exposures. Additional review or reporting on risks is conducted as needed or as requested by the Board or one of its committees.

280.    Regarding the Company's Code of Ethics, the 2025 Proxy Statement provided:

> We have adopted a Code of Business Conduct and Ethics. This code of ethics applies to our directors, executive officers and employees. This code of ethics is publicly available in the corporate governance section of the Investor Relations page of our website located at *https://investors.mullenusa.com /governance#governancedocuments* and in print upon request to the Secretary at Mullen Automotive Inc., 1405 Pioneer Street, Brea, California, 92821. If we make amendments to the code of ethics or grant any waiver that the SEC requires us to disclose, we will disclose the nature of such amendment or waiver on our website.

281.    Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, MAEO and Volt Mobility; (2) the Company overstated its battery technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements; and (6) Individual Defendants' participation

in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

282.   The 2025 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

283.   As a result of Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen causing the 2025 Proxy Statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Michery, Novoa, and Winter to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve the issuance of shares of common stock to the CEO pursuant to amendments to Performance Stock Award Agreements; (3) approve the Second Amended 2022 Plan to increase the number of shares of common stock authorized for issuance by 20,000,000 shares; (4) approve a second and separate amendment to the 2022 Plan for the adoption of an automatic annual increase in the shares of common stock available for issuance under the 2022 Plan, thereby allowing the number of shares available for issuance under the 2022 Plan to automatically increase on October 1st of each year, commencing on October 1, 2025 until the Plan's expiration in July 2032; (5) approve an amendment to the Company's Second Amended and Restated COI to increase the authorized number of shares of preferred stock to 1,000,000,000; (6) approve the amendment of the Company's Second Amended and Restated COI to effect a reverse stock split; and (7) ratify the appointment of RBSM LLP as the independent registered public accounting firm of the Company for the 2025 Fiscal Year.

284.   As a result of the shareholders approving the Second Amended 2022 Plan, an additional 20,000,000 shares were made available for disbursement, allowing for a total of 31,304,070 shares. As such, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Second Amended 2022 Plan in the future.

### THE TRUTH FULLY EMERGES

#### *March 20, 2025 Volt Mobility Termination Notice*

285.   On March 20, 2025, Mullen disclosed that it had issued a termination notice to Volt Mobility regarding the Purchase Agreement originally signed on August 23, 2024. This announcement effectively confirmed what had become apparent, that Mullen was unable to meet its obligations under the agreement, particularly due to its inability to deliver vehicles that complied with the UAE's homologation standards.

286.   On this news, the Company's share price fell 30.6% over two trading days, from $0.40 to a low of $0.2773, and closing at $0.289 on March 21, 2025.

#### *April 9, 2025 Reverse Stock Split Announcement*

287.   Then, on April 9, 2025, the Company issued a press release announcing a 1-for-100 reverse stock split, which took effect on April 11, 2025.

288.   On this news, Mullen's stock price declined by 12.1%, falling from an opening price of $0.041 to a low of $0.036 before closing at $0.04. This marked the sixth reverse stock split Mullen executed during the Relevant Period.

#### *May 29, 2025 Reverse Stock Split Announcement*

289.   On May 29, 2025, Mullen issued a press release announcing a 1-for-100 reverse stock split, its seventh of the Relevant Period, set to take effect on June 2, 2025.

290.   On this news, the price of the Company's stock fell sharply, dropping 41.7% over the next two trading days, from an opening price of $0.127 to a low of $0.074, before closing at $0.082 on May 30, 2025.

# **INDIVIDUAL DEFENDANTS' KNOWLEDGE**

### *The Individual Defendants' Access to and Actual Knowledge of Contradictory Information*

291.   The Individual Defendants had access to and received information concerning Mullen's plans to implement reverse stock splits; the EMM technology that was central to the Company's $680,000 agreement with Washington, D.C.; and the fact that Mullen's vehicles were not compliant with the UAE's homologation requirements.

292.   Defendants Michery and New held senior executive roles at Mullen, affording them full access to, and control over, the Company's reverse stock split plans. Notably, Defendant Michery exercised control over the January 2023 shareholder vote authorizing a reverse stock split, leveraging his 1.3 billion voting shares. Further, Defendant Michery explicitly stated that he and the Company's Board determined the timing for enacting a reverse split in the Company's SEC filings and in open letters to investors.

293.   Their executive roles also gave them direct access to information about Mullen's collaboration with EVT and its purported EMM technology, as well as the Company's inability to comply with the homologation standards required for its $210 million agreement with Volt Mobility. Both Defendants Michery and New participated in weekly executive meetings where Mullen's operations and forward-looking plans were discussed. On information and belief, these meetings included conversations about Mullen's homologation issues, the Company's failure to fulfill the terms of the Volt Mobility contract, the unverifiable nature and ineffectiveness of EVT/EMM technology, and the Company's ties to a convicted felon.

294.   According to CW1, Defendant Michery, Defendant New, and other Mullen executives participated in regular Tuesday conference calls to discuss the Company's operations and business outlook. Based on standard practice and Defendant New's prior acknowledgment of homologation issues to CW1, it is believed that the Volt Mobility deal, and Mullen's inability to meet UAE homologation standards, was discussed during these meetings.

295.  Furthermore, Defendant New was personally informed multiple times by CW1 during phone calls in July 2023 that Mullen's vehicles did not meet the UAE's homologation standards, which is a fact Defendant New acknowledged.

296.  CW1 reported speaking with Corry Davis, Mullen's head of homologation, who confirmed that the vehicles were at least one year and $25 million in upgrades away from meeting the UAE's homologation certification criteria.

297.  CW1 also had multiple phone conversations in mid-July 2024 with both Defendant New and Chief Accounting Officer, Chester Bragado, regarding the Company's inability to sell vehicles in the Middle East due to the failure to meet homologation standards. According to CW1, Defendant New acknowledged this issue but said that Defendant Michery still wanted to proceed with a deal with Volt Mobility, a UAE-based company. Defendant New reportedly explained that Defendant Michery intended to begin shipping vehicles immediately and address the homologation issues afterward.

298.  Accordingly, both Defendants Michery and New not only had access to, but actually received, much or all of the information that directly contradicted their public representations.

***Defendant Michery Presented Himself as Knowledgeable About the Concealed Information***

299.  Defendant Michery's own public statements consistently portrayed him as being well-informed about Mullen's plans to execute a reverse stock split, the Company's partnership with EVT and Hardge, and the $210 million agreement with Volt Mobility. For instance, Defendant Michery frequently discussed Mullen's intentions and decision-making process regarding reverse stock splits.

300.  Additionally, he repeatedly spoke about the Company's relationship with EVT and Hardge, being quoted in several press releases that promoted the partnership and highlighted EVT's so-called "groundbreaking" technology.

301.  Defendant Michery was also quoted in a press release announcing the Volt Mobility deal, and further promoted the transaction directly to investors on X.

302.   Therefore, Michery's public posture as someone informed about these concealed matters leads to only two plausible conclusions: either he did possess the knowledge he claimed and knowingly withheld material adverse information from investors; or, while holding himself out as knowledgeable, he failed to ascertain the truth and acted with reckless disregard for the risk of misleading investors.

### The Individual Defendants Were Strongly Motivated to Mislead Investors and Conceal Defendant Michery's Scheme

303.   At the beginning of the Relevant Period, the Individual Defendants had a clear incentive to mislead both investors and NASDAQ regarding their true intentions to implement a reverse stock split. Their primary goal was to artificially raise Mullen's stock price above NASDAQ's $1.00 minimum bid requirement. On September 7, 2022, the SEC notified Mullen that its stock had traded below $1.00 for 30 consecutive business days, placing the Company out of compliance with NASDAQ's listing standards. Mullen was initially given 180 days, until March 6, 2023, to regain compliance.

304.   As that deadline approached and Mullen's stock remained below $1.00, the Company requested a 180-day extension, pushing the deadline to September 5, 2023. To secure this extension, the Individual Defendants publicly committed to avoiding a reverse stock split before September 6, 2023, presenting this as a show of good faith and sound governance. In reality, however, they fully anticipated that a reverse split would be necessary prior to that date. This misrepresentation was successful: on March 8, 2023, NASDAQ granted the extension. Thus, the Individual Defendants had a clear motive to deceive the market and investors about their plans in order to obtain the additional compliance window.

305.   Beyond the compliance issue, the Individual Defendants were further motivated to carry out their scheme because Mullen functioned effectively as a personal financial vehicle for Defendant Michery, who also rewarded insiders like Defendant New. Both were paid excessive salaries disproportionate to the Company's actual performance in the EV market. In addition, Company funds were used to support Dependent Michery's

personal expenses.

***The Individual Defendants' Knowledge Is Reinforced by the Fact That Their Misrepresentations Concerned Mullen's Survival***

306.   The Individual Defendants' knowledge is further evidenced by the critical nature of the alleged misstatements and omissions, which directly impacted Mullen's ability to remain a going concern. Absent the use of reverse stock splits and deceptive public announcements designed to generate investor interest, Mullen faced an imminent risk of delisting from NASDAQ. As Defendant Michery himself admitted during the Relevant Period, lenders were unwilling to provide financing unless Mullen's shares remained listed on a major exchange, citing diminished market making and trading volumes associated with delisted securities. Moreover, the Company lacked any viable commercial operations, such as meaningful vehicle sales or licensing of battery technology, to offset its operational losses. As such, sustaining the scheme was essential to keeping the Company afloat.

307.   In light of these circumstances, it would be wholly unreasonable to conclude that Mullen's top executives and directors acted without actual knowledge or, at minimum, extreme recklessness when making false and misleading statements to investors.

## DAMAGES TO MULLEN

308.   As a direct and proximate result of the Individual Defendants' conduct, Mullen has lost and will continue to lose and expend many millions of dollars.

309.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

310.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

311.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

312.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

313.   As a direct and proximate result of the Individual Defendants' conduct, Mullen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

314.   Plaintiff brings this action derivatively and for the benefit of Mullen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mullen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

315.   Mullen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

316.   Plaintiff is, and has been at all relevant times, a shareholder of Mullen. Plaintiff will adequately and fairly represent the interests of Mullen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

317.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

318.   A pre-suit demand on the Board is futile and, therefore, excused. When this

action was filed, Mullen's Board consisted of the following seven individuals: Defendants Michery, Andersen, Betor, Miltner, Novoa, Puckett, and Winter (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

319. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

320. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Mullen to issue materially false and misleading statements. Specifically, the Director-Defendants caused Mullen to issue false and misleading statements which were intended to make Mullen appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

321. Moreover, the Director-Defendants solicited the 2023 Proxy Statement, which called for shareholder votes to, *inter alia*, re-elect Defendants Puckett and Betor to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

322. In addition, the Director-Defendants caused the 2023 Proxy Statement to call for a shareholder vote to approve the Amended 2022 Plan, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended 2022 Plan, who would not have approved the Amended 2022 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Amended 2022

Verified Shareholder Derivative Complaint

Plan at the annual meeting of stockholders on August 3, 2023, there were 7,000,000 shares available under the then-existing plan. After the shareholders approved the Amended 2022 Plan, 52,000,000 additional shares were made available under the plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the Amended 2022 Plan pursuant to the 2023 Proxy Statement. As such, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

323.    Moreover, the Director-Defendants solicited the 2024 Proxy Statement, which called for shareholder votes to, *inter alia*, re-elect Defendants Miltner and Andersen to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

324.    Further, the Director-Defendants solicited the 2025 Proxy Statement, which called for shareholder votes to, *inter alia*, re-elect Defendants Michery, Novoa, and Winter to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

325.    Additionally, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the Second Amended 2022 Plan, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Second Amended 2022 Plan, who would not have approved the Second Amended 2022 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Second Amended 2022 Plan at the annual meeting of stockholders on March 13, 2025, there were 17,384,753 shares available under the then-existing plan. After the shareholders approved the Amended 2022 Plan, 20,000,000 additional shares were made available under the plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders

approving the Second Amended 2022 Plan pursuant to the 2025 Proxy Statement. As such, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

326.   Additional reasons that demand on Defendant Michery is futile follow. Defendant Michery has served as Chairman of the Board and as CEO of the Company since November 2021. The Company provides Defendant Michery with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Michery signed the false and misleading 1Q23 and 2Q23 10-Qs and FY 24 10-K. Further, Defendant Michery is a defendant in the Securities Class Action. Additionally, Defendant Michery has received stock awards under the Amended 2022 Plan, the Second Amended 2022 Plan, and the CEO PSA Agreement, is eligible to receive stock awards under the Amended 2022 Plan, the Second Amended 2022 Plan, and the CEO PSA Agreement, and will continue to receive stock awards under the Amended 2022 Plan, the Second Amended 2022 Plan, and the CEO PSA Agreement, thereby materially benefiting from the adoption of the Amended 2022 Plan, the Second Amended 2022 Plan, and the CEO PSA Agreement. Defendant Michery has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $4.7 million. For these reasons, too, Defendant Michery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is

futile and, therefore, excused.

327.    Additional reasons that demand on Defendant Andersen is futile follow. Defendant Andersen has served as a Company director since September 2022. He also serves as a member of the Audit Committee and a member of the Compensation Committee. In addition, Defendant Andersen receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Andersen also signed the false and misleading FY24 10-K. Additionally, Defendant Andersen has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. Moreover, Defendant Andersen has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, netting personal proceeds of approximately $347,997. For these reasons, too, Defendant Andersen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

328.    Additional reasons that demand on Defendant Betor is futile follow. Defendant Betor has served as a Company director since November 2021. He also serves as a member of the Audit Committee and Compensation Committee and as Chair of the Nominating & Governance Committee. In addition, Defendant Betor receives handsome compensation from the Company for his role as a director. As a trusted director, he

conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Betor also signed the false and misleading FY24 10-K. Additionally, Defendant Betor has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. For these reasons, too, Defendant Betor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

329. Additional reasons that demand on Defendant Miltner is futile follow. Defendant Miltner has served as a Company director since November 2021. In addition, Defendant Miltner receives handsome compensation from the Company for his role as a director. Defendant Miltner also provides legal services to the Company. Thus, as the Company admits, Defendant Miltner is a non-independent director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Miltner also signed the false and misleading FY24 10-K. Additionally, Defendant Miltner has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. For these reasons, too, Defendant Miltner breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

330.    Additional reasons that demand on Defendant Novoa is futile follow. Defendant Novoa has served as a Company director since July 2022. In addition, Defendant Novoa receives handsome compensation from the Company for his role as a director. The Company admits that Defendant Novoa is a non-independent director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Novoa also signed the false and misleading FY24 10-K. Additionally, Defendant Novoa has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. Moreover, Defendant Novoa has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, netting personal proceeds of approximately $151,316. For these reasons, too, Defendant Novoa breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

331.    Additional reasons that demand on Defendant Puckett is futile follow. Defendant Puckett has served as a Company director since November 2021. He also serves as Chair of the Audit Committee, Chair of the Compensation Committee, and as a member of the Nominating & Governance Committee. In addition, Defendant Puckett receives handsome compensation from the Company for his role as a director. As a trusted director,

he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Puckett also signed the false and misleading FY24 10-K. Additionally, Defendant Puckett has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. Moreover, Defendant Puckett has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, netting personal proceeds of approximately $33,000. For these reasons, too, Defendant Puckett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

332. Additional reasons that demand on Defendant Winter is futile follow. Defendant Winter has served as a Company director since November 2021. She also serves as the Company's Secretary and as a member of the Nominating & Governance Committee. The Company provides her with her principal occupation for which she receives lucrative compensation. Thus, Defendant Winter is a non-independent director. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Winter also signed the false and misleading FY24 10-K. Additionally, Defendant Winter has received stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, is eligible

to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, and will continue to receive stock awards under the Amended 2022 Plan and the Second Amended 2022 Plan, thereby materially benefiting from the adoption of the Amended 2022 Plan and the Second Amended 2022 Plan. Moreover, Defendant Winter has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $243,771. For these reasons, too, Defendant Winter breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

333.   Additional reasons that demand on the Board is futile follow.

334.   Defendants Michery, Puckett, Novoa, and Betor all work together on a joint business venture that preclude them from acting independently and in the best interests of the Company and its shareholders. Defendants Michery, Puckett, Novoa, and Betor are all members of the board of directors of DRIVEiT, a separate business venture that is not owned by the Company. In his position as CEO, Defendant Michery has directed Mullen employees to spend their time working on DRIVEiT projects, despite the Company having no ownership interest in it, instead of focusing on securing deals for Mullen. Moreover, Mullen supplies its commercial EVs to DRIVEiT as part of its product offerings. These conflicts of interest render Defendants Michery, Puckett, Novoa, and Betor beholden to each other as they cannot disinterestedly consider a demand to sue partners in a lucrative business venture. Thus, demand upon Defendants Michery, Puckett, Novoa, and Betor would be futile.

335.   Defendants Puckett (as Chair), Andersen, and Betor served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's

compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

336.   In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

337.   Mullen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Mullen any part of the damages Mullen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

338.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-

Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

339.   The acts complained of herein constitute violations of fiduciary duties owed by Mullen's officers and directors, and these acts are incapable of ratification.

340.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mullen. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Mullen, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

341.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Mullen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

342.   Thus, for all of the reasons set forth above, all of the Director-Defendants,

and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen for Violations of Section 14(a) of the Securities and Exchange Act of 1934**

343.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set-forth herein.

344.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

345.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

346.    Under the direction and watch of the Individual Defendants, the 2023, 2024, and 2025 Proxy Statements failed to disclose that (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

347.    The 2023, 2024, and 2025 Proxy Statements failed to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, MAEO and Volt Mobility; (2) the Company overstated its battery technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements; and (6) Individual Defendants' participation in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

348.    In the exercise of reasonable care, Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023, 2024, and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023, 2024, and 2025 Proxy Statements, including election of directors and the passage to multiple amendments to the Company's Equity Incentive Stock Plan.

349.    The Company was damaged as a result of Defendants Michery, Winter, Novoa, Puckett, Betor, Miltner, and Andersen material misrepresentations and omissions in the 2023, 2024, and 2025 Proxy Statements.

350.    Plaintiff, on behalf of Mullen, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

351.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

352.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mullen's business and

affairs.

353.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

354.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mullen.

355.    In breach of their fiduciary duties owed to Mullen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company overstated its deals with its purported business partners, MAEO and Volt Mobility; (2) the Company overstated its battery technology; (3) Individual Defendants mislead the public about future reverse stock splits; (4) the Individual Defendants failed to conduct proper due diligence and disclosure regarding Hardge's previous financial crimes; (5) Individual Defendants failed to disclose material information about the Company's financing agreements; and (6) Individual Defendants' participation in the scheme to use the Company as Defendant Michery's personal slush fund. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

356.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

357.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

358.    In yet further breach of their fiduciary duties, during the Relevant Period, while shares of Company common stock traded at artificially inflated prices before the

fraud was exposed, six of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $5.5 million.

359.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities.

360.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Mullen's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

361.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

362.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mullen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

363.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

364.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

365.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mullen.

366.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Mullen that was tied to the performance or artificially inflated valuation of Mullen, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

367.   Plaintiff, as a shareholder and a representative of Mullen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

368.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

369.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

370.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mullen, for which they are legally responsible.

371.  As a direct and proximate result of the Individual Defendants' abuse of control, Mullen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

372.  Plaintiff, on behalf of Mullen, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

373.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

374.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mullen in a manner consistent with the operations of a publicly held corporation.

375.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mullen has sustained and will continue to sustain significant damages.

376.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

377.  Plaintiff, on behalf of Mullen, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

378.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

379.  The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

380.  As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Mullen

to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

381.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

382.   Plaintiff, on behalf of Mullen, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Michery and New for Contribution Under Sections 10(b) and 21D of the Exchange Act

383.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

384.   Mullen and Defendants Michery and New are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Michery's and Defendant New's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

385.   Defendants Michery and New because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

386.   Accordingly, Defendants Michery and New are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

387.   As such, Mullen is entitled to receive all appropriate contribution or

indemnification from Defendants Michery and New.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Mullen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mullen;

(c)    Determining and awarding to Mullen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Mullen and the Individual Defendants to take all necessary actions to reform and improve Mullen's corporate governance and internal procedures to comply with applicable laws and to protect Mullen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Mullen to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Mullen restitution from Individual Defendants, and each of them;

Verified Shareholder Derivative Complaint

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 10, 2025                  Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Paolo Nestori, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10 day of October, 2025.

Paolo Nestori